Stephon NEWCOMB, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2009–SC–000726–MR.

Supreme Court of Kentucky.

April 25, 2013.

Rehearing Denied Oct. 24, 2013.

La Mer Kyle–Griffiths, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Courtney J. Hightower, Assistant Attorney General, Todd Dryden Ferguson, Assistant Attorney General Office of Criminal Appeals, Office of the Attorney General, Frankfort, KY, for appellee.

Opinion of the Court by Chief Justice MINTON.

A circuit court jury convicted Stephon Newcomb of two counts of first-degree rape, one count of first-degree criminal trespass, and one count of intimidating a participant in a legal proceeding. Newcomb received a sentence of 25 years' imprisonment for his convictions.

He now appeals from the judgment as a matter of right,[1] contending

1) the trial court erroneously declined to sever the charges involving two alleged female victims for separate trials;

2) he was entitled to a directed verdict on the rape charges relating to one of the alleged victims;

3) a *Batson* violation occurred because the Commonwealth struck the only African American from the jury panel, and Newcomb is an African American male;

4) the trial court improperly prohibited him from introducing evidence necessary to his defense and erroneously limited the scope of cross-examination;

---

1. Ky. Const. § 110(2)(b).

5) the prosecutor's improper questioning during voir dire and closing argument denied him due process and a fair trial;

6) the prosecutor engaged in misconduct by testifying during the closing argument;

7) cumulative error occurred; and

8) the trial court erroneously classified him as a violent offender. Finding no error as to any of these contentions, we affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND.

The charges against Newcomb involved the rape of two female victims, Karen and Jennifer.[2] Karen and Newcomb were minors at the time of the separate attacks, which occurred in the same community ten days apart. At trial, Newcomb admitted that he had sex with both alleged victims but claimed that it was consensual.

### A. The Alleged Rape of Karen.

The first alleged victim, Karen, was 17 years old at the time of the offense. She and Newcomb both worked at Burger King, but their work schedules overlapped infrequently. Karen and Newcomb also attended the same high school, and Newcomb played basketball with a boy whom Karen frequently dated. Karen testified that she only associated with Newcomb when their work shifts overlapped. She claimed that they were not romantically involved, and she denied ever having kissed Newcomb.

On the day of the alleged rape, Newcomb and Karen were working the drive-through at Burger King. Upon receiving permission from her mother, Karen agreed to drive Newcomb home after work because he needed a ride. As Newcomb and Karen neared Newcomb's house, they saw someone walking outside the house. Newcomb told Karen to drive past his house because he needed to talk with her.

Newcomb directed Karen to a deserted parking lot, where she stopped the car. When Karen put the car in park, Newcomb removed the keys from the ignition, leaned toward Karen, and began kissing her neck. Karen told Newcomb that he had the wrong idea and told him to stop. Newcomb then started to remove his pants, and Karen pushed him away, telling him that they were not going to have sex. Newcomb moved back into the passenger side of the car and said that he could not believe Karen was doing this. When Karen demanded the car keys, Newcomb grabbed her hair and pulled her on top of him. While holding Karen by the hair, Newcomb pulled down her pants and raped her.

When he finished, Newcomb pushed Karen away and told her not to worry because he withdrew his penis before ejaculating. Newcomb stepped out of the car to pull his pants up and gave Karen the car keys. While Karen drove Newcomb home, he repeatedly told her, "You know you like me, you think I'm cute." Upon arriving home, Karen went straight to the bathroom because she was bleeding. Ten days later, Karen informed her mother about the rape.

At trial, Newcomb testified that when Karen received permission to drive him home, they planned to have sex there. When they saw that one of his family members was at home, they drove to the deserted parking lot where they had con-

2. The names of all minors in this opinion have been replaced with pseudonyms to preserve their privacy. The first victim will be referred to as Karen, and the second victim will be referred to as Jennifer.

sensual sex. Kevin Vogle, another Burger King employee and Newcomb's childhood friend, testified at trial that some day before the incident, he saw Newcomb and Karen sitting in Karen's car in the Burger King parking lot. From a glance, they appeared to be either kissing or whispering in each other's ear.

## B. The Alleged Rape of Jennifer.

The second alleged victim, Jennifer, was 20 years old at the time. Jennifer knew Newcomb because they lived in the same neighborhood. Newcomb dropped by Jennifer's house occasionally to visit her and her brother, and she and Newcomb were friendly. But they were not closely associated, and she knew Newcomb only by his first name.

On a day that was about ten-days after the alleged rape of Karen, Jennifer was at home collecting her laundry to take to Alicia Carroll's house for washing when she realized Newcomb was standing in her living room. The door to Jennifer's house had not been completely shut, but she did not invite Newcomb into her house; he just appeared without announcing himself.

Newcomb forced Jennifer to him and started kissing her neck, saying, "You know you want me." Jennifer resisted his advances and demanded that he leave. But he kept kissing her neck and told her, "Don't push me away. You know you want me." She again told him no.

Newcomb then started unfastening Jennifer's belt, but she re-fastened it. Newcomb loosened her belt again; and, at that point, Jennifer froze in fear. Newcomb then had intercourse with Jennifer on her couch, against her will. Jennifer testified that she did not scream or fight Newcomb because she was afraid and in shock. Newcomb ejaculated on either Jennifer's couch or blanket and then immediately left her residence.

Jennifer did not immediately report the attack to the police. But sometime after Newcomb left her house, Jennifer went to Carroll's residence, as planned, to do her laundry. Carroll testified at trial that Jennifer asked her to guess whom she had just had sex with and said it was Newcomb.

A few days after the alleged rape of Jennifer,[3] Newcomb appeared at Jennifer's house. This time he was accompanied by a group of his friends. Jennifer testified that Newcomb threatened to hurt anyone who accused him of rape. But Carroll testified that she was part of the group in Jennifer's house that day, and it was her idea to confront Jennifer about rumors that Newcomb raped Jennifer. Carroll claimed that no one in the group threatened Jennifer. Newcomb's testimony aligned with Carroll's on that point.

This group-confrontation frightened Jennifer, and she left home to stay with her friend Amber Ellis. Ellis testified that Jennifer did not want to be alone at Ellis's house. Jennifer even accompanied Ellis to work and sat outside in the car. Jennifer eventually told Ellis that Newcomb raped her. Ellis took Jennifer to the hospital even though Jennifer protested. Hospital employees reported the attack to the police.[4]

---

3. This was two days after Karen reported Newcomb's attack on her to the police.

4. The doctor who treated Jennifer testified at trial to what Jennifer reported to him. Jennifer told the doctor that she was at her house when the attacker kissed her neck and pulled her pants down. She pulled them back up and struggled with the man who kept pulling them down. She repeatedly protested and was crying when he forced himself upon her. Jennifer requested to be a confidential patient and did not ask the hospital to report the rape to the police.

Newcomb testified that on the day he and Jennifer had sexual intercourse, he had been at her residence earlier hanging out with friends. When everyone stepped outside the residence to get some air, Newcomb left his jacket behind. When he returned to retrieve it, the two began flirting, touching, kissing, and had sexual intercourse on her couch. Newcomb admitted that a few days later he went to Jennifer's house with a group of people to ask her about rumors that he had raped her. But he denied that anyone threatened Jennifer. He also claimed that he saw Jennifer at another gathering a short while later, and she gave him a hug.

## C. Procedural Background of the Case Against Newcomb.

A single indictment from the grand jury charged Newcomb with two counts of first-degree rape and one count each of second-degree burglary, intimidating a participant in a legal proceeding, and second-degree unlawful imprisonment. All charges were tried together.

Newcomb's first trial ended in a hung jury, and the trial court declared a mistrial. In the second trial, at which Jennifer failed to appear to testify,[5] the jury convicted Newcomb of two counts of first-degree rape, one count of first-degree criminal trespass, and one count of intimidating a witness in a legal proceeding. The jury recommended consecutive sentences amounting to 45 years' imprisonment. But the trial court ordered Newcomb's rape sentences to run concurrently and consecutively to a witness-intimidation sentence, for a total sentence of 25 years' imprisonment. Newcomb now appeals the judgment to this Court.

## II. THE TRIAL COURT PROPERLY DECLINED NEWCOMB'S MOTION FOR SEPARATE TRIALS.

Before the first trial, Newcomb moved to sever the charges and try each of the two rapes in a separate trial. He renewed the severance motion before his second trial. He argued that the charges were improperly joined under Kentucky Rules of Criminal Procedure (RCr) 6.18; and that even if properly joined, RCr 9.16 required severance for trial. The trial court denied severance, reasoning that evidence of each rape would be admissible in a separate trial of the other under Kentucky Rules of Evidence (KRE) 404(b), specifically the modus operandi exception.

Newcomb also moved for a mistrial at the close of the Commonwealth's case in the second trial, arguing that the Commonwealth failed to prove sufficient facts to join the offenses for trial. Again, the trial court denied the motion.

Newcomb now contends the trial court erred by failing to sever the two offenses for trial under RCr 9.16 because he was prejudiced by the joinder. He asserts that he was prejudiced because the credibility of each complaining witness was unfairly bolstered and because Jennifer—who accused him of threatening to kill her if she accused him—failed to appear at the second trial.

We affirm the trial court's decision to deny severance.

■ "[A] trial court has broad discretion with respect to joinder,"[6] and "[a] conviction based on joinder of offenses should only be reversed if there is a clear showing of abuse of discretion and prejudice to the

---

5. Jennifer's videotaped testimony at Newcomb's first trial was played for the jury at the second trial.

6. *Rearick v. Commonwealth,* 858 S.W.2d 185, 187 (Ky.1993) (citation omitted).

defendant."[7] Two rules of criminal procedure control the joinder of offenses. RCr 6.18 provides:

> Two (2) or more offenses may be charged in the same complaint or two (2) or more offenses whether felonies or misdemeanors, or both, may be charged in the same indictment or information in a separate count for each offense, if the offenses are of the same or similar character or are based on the same acts or transactions connected together or constituting parts of a common scheme or plan.

Even when offenses in a complaint, indictment, or information are properly joined under RCr 6.18, severance may still be required under RCr 9.16:

> If it appears that a defendant or the Commonwealth is or will be prejudiced by a joinder of offenses ... for trial, the court shall order separate trials of counts ... or provide whatever other relief justice requires. A motion for such relief must be made before the jury is sworn.... [8]

■ Newcomb does not take issue on appeal with the joinder of the two rape offenses in the single indictment as allowed by RCr 6.18. His argument focuses on RCr 9.16 because he claims joinder of the offenses prejudiced him at trial. "A significant factor in identifying such prejudice is the extent to which evidence of one offense would be admissible in a trial of the other offense."[9] If evidence necessary to prove each rape offense would have been admissible in a separate trial of the other rape offense, the joinder was not unduly prejudicial.[10]

KRE 404(b) controls the admission of a defendant's prior bad acts into evidence at trial.

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

"Among the non-enumerated exceptions we have recognized to KRE 404(b)'s general prohibition on the introduction of prior bad acts evidence is ... modus operandi."[11]

■ Modus operandi is the exception advanced here by the Commonwealth and accepted by the trial court. "The modus operandi exception requires the facts surrounding the prior misconduct [ ] be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea*."[12] The theory here is that evidence of each rape would be admissible in the trial of the other rape in order to prove the corpus delicti, *i.e.,* "that the offense, in fact, occurred, by demon-

---

7. *Chestnut v. Commonwealth,* 250 S.W.3d 288, 299–300 (Ky.2008) (citation omitted).

8. RCr 9.16.

9. *Rearick,* 858 S.W.2d at 187 (citation omitted).

10. To a certain extent, prejudice is inherent in the joinder of offenses for trial. "[T]he real issue is whether [a defendant] was *unduly* prejudiced, *i.e.,* whether the prejudice to [the defendant] was unnecessary and unreasonable." *Price v. Commonwealth,* 31 S.W.3d 885, 888 (Ky.2000) (citing *Romans v. Commonwealth,* 547 S.W.2d 128 (Ky.1977)).

11. *Clark v. Commonwealth,* 223 S.W.3d 90, 96 (Ky.2007) (citation omitted).

12. *Id.* (citation and internal quotations omitted).

strating a modus operandi."[13] Even when, as in this case, evidence that establishes modus operandi is offered for a purpose other than to prove identity, the evidence is treated "as if offered to prove identity by similarity, and ... the details of the charged and uncharged acts [must] be sufficiently similar as to demonstrate a modus operandi."[14] "Although it is not required that the facts be identical in all respects, evidence of other acts of sexual deviance ... must be so similar to the crime on trial as to constitute a so-called signature crime."[15]

■ The trial court in the present case found the facts surrounding the two rapes sufficiently similar that evidence of each rape would be admissible in the trial of the other rape, such that Newcomb was not prejudiced by joinder of the offenses at trial. The trial court based its finding on the similar allegations of when and how Newcomb used force, the nature of Newcomb's association with the victims, the temporal proximity of the acts, and the timing of the victims' complaints. Upon review, we cannot say that the trial court clearly abused its discretion in joining the offenses for trial.

We find *Clark v. Commonwealth*[16] instructive on this issue. In that case, Clark was convicted of two counts of first-degree sexual abuse committed against two victims. On the basis of the modus operandi exception, the trial court permitted the Commonwealth to offer the testimony of Clark's prior sexual-abuse victim. We found the testimony inadmissible because Clark's prior abuse of the testifying victim was not similar enough to the sexual abuse for which Clark was being tried. In so holding, we carefully reviewed the significance that each similarity and dissimilarity among the instances of abuse played in applying the modus operandi exception. After comparing the evidence in the present case to that in *Clark*, we hold that the sexual attacks on Karen and Jennifer are

**13.** *Dickerson v. Commonwealth*, 174 S.W.3d 451, 468 (Ky.2005). We disagree with the dissent's claim that when used to prove the corpus delicti, the probative value of modus operandi evidence is derived solely from the presumption that the unproven accusation of crime must be true because the accused had committed the same crime before. If two or more victims allege strikingly similar facts, it tends to show the accused has a mode or method of operation. It refutes a contention that the victims are fabricating their complaints and tends to prove that the alleged crimes did, in fact, occur. *See* McCormick on Evidence, Ch. 17 § 190 (John W. Strong ed., 5th ed. 2003) ("[I]f the rapist's method of operation is calculated to create the appearance of consent on the part of the victim, the similar acts evidence may be admitted to negate the defense of consent.") (citing *Oliphant v. Koehler*, 594 F.2d 547, 550–54 (6th Cir. 1979)). This is distinct from an accused's propensity to commit a type of crime. It is only when the acts are dissimilar that use of the evidence tends solely to prove an accused's criminal disposition.

This reasoning is reflected in a long line of Kentucky cases. *See, e.g., Billings v. Commonwealth*, 843 S.W.2d 890 (Ky.1992) ("[W]e have long recognized that the degree of similarity between the charged and the uncharged acts is a critical factor in establishing a direct relationship independent of character. As the degree of similarity increases, and a modus operandi appears, inferences are more likely to be drawn from the events' common *facts* rather than their common *criminality*."); *Pendleton v. Commonwealth*, 685 S.W.2d 549 (Ky. 1985) (holding that testimony of rape victim's older sister "was admissible as showing a method of operation of sexual activity with his young daughters and to indicate a common and continuing pattern of conduct on the part of the accused.").

**14.** *Billings v. Commonwealth*, 843 S.W.2d 890, 893 (Ky.1992).

**15.** *Dickerson*, 174 S.W.3d at 469 (citation and internal quotations omitted).

**16.** 223 S.W.3d 90 (Ky.2007).

similar enough to satisfy the modus operandi exception.

■ As in *Clark*, we stress that "conduct that serves to satisfy the statutory elements of an offense will not suffice to meet the modus operandi exception."[17] And "two acts involving sexual crimes are not necessarily 'similar.' "[18] So the fact that Newcomb had sexual intercourse with both Karen and Jennifer is not sufficient to justify joinder of the offenses in this matter. But the two attacks share more similarities than the simple criminality of the events.

Newcomb had a similar relationship with each victim. Newcomb was acquainted with both Karen and Jennifer at the time of the attacks, though through different social venues: Newcomb and Karen worked together, while Newcomb knew Jennifer from the neighborhood. According to the proof put on by the Commonwealth, Newcomb had no prior romantic or sexual relationship with either Karen or Jennifer. Compare this state of the evidence with *Clark*, where Clark's role was vastly different with one of his three victims. Clark was acting as a counselor or confessor with one of his victims; but with the other two victims, he was a longtime family friend, which did not involve his role as a priest. Unlike in *Clark*, we cannot say that Newcomb's associations with Karen and Jennifer were vastly different. Although the factual circumstances varied somewhat, these were not random attacks on strangers; nor were the victims romantically involved with Newcomb. So Newcomb's level of acquaintance with his vic-

tims weighs in favor of the modus operandi exception.

Karen and Jennifer were also the same gender, race, and approximate age; both were young Caucasian women, very near the age of majority at the time of the attacks. Even in *Clark* where the victims' ages were statutory elements of the defendant's crimes, the fact that the victims were of similar ages was "entitled to at least some weight toward meeting the Commonwealth's burden under the modus operandi exception."[19] Here, the victims' ages were not elements of the crime[20] and weigh in favor of the modus operandi exception. But we do acknowledge that in this case, the victims' ages is not strong evidence of a signature crime because Newcomb and his victims were of similar ages.

The Commonwealth's proof also established that the offenses were carried out in a similar manner. Both attacks began by forcible kissing on the neck. Newcomb then forcibly removed the victims' pants but no other articles of clothing. And he ejaculated outside of the victims. No other sexual touching occurred apart from the act of sexual intercourse. Newcomb also expressed similar sentiments to both victims—he told Karen, "You know you like me," and told Jennifer, "You know you want me."

In *Clark*, the Commonwealth supported its modus operandi argument with the fact that Clark put his hands inside each victim's pants and fondled the penis. We held that the fact that the defendant "never sought reciprocal sexual contact by any of the three victims weighs in favor of a modus operandi exception...."[21] But

---

17. *Id.* at 98.

18. *Billings*, 843 S.W.2d at 893.

19. *Clark*, 223 S.W.3d at 98.

20. Newcomb was convicted of first-degree rape by forcible compulsion under KRS 510.040(1)(a).

21. *Clark*, 223 S.W.3d at 99.

Clark subjected only two of his three victims to oral-genital contact. So "[t]he lack of a consistent allegation that Clark placed his mouth on the penis of all of his victims greatly undercut[ ] the purported distinct pattern to Clark's abuse." [22] Unlike *Clark,* the attacks on Karen and Jennifer did not differ significantly; Newcomb inflicted no additional sexual acts upon either victim than the other.

We recognize some differences between the two attacks. Newcomb asked Karen for a ride home from work and raped her in a car parked in a deserted lot, while he attacked Jennifer in her home; Newcomb worked with Karen, but he knew Jennifer from the neighborhood; and Newcomb did not hold Jennifer by the hair as he did Karen. But these differences are not dispositive of the modus operandi exception. In *Clark,* we agreed "with the trial court that it is not necessary that the abuse always occur in the same geographical location...." [23]

And, in *Edmonds v. Commonwealth,* [24] we upheld joinder of counts regarding two victims despite the fact that significant differences existed between the attacks. We determined that the facts in each offense were strikingly similar because Edmonds approached each victim outside her home and elicited an invitation into her residence through the guilt of his feigned friendship; once inside, he attacked each victim and bound them with articles of her own clothing; he first vaginally raped, then anally sodomized each victim; and appellant threatened the life of each victim

if she reported the crime to the authorities. Following his attack on the first victim, Edmonds remained in her home throughout the evening. But after Edmonds attacked the second victim, he forced her at knifepoint to drive him to an A.T.M. and withdraw money from her bank account, at which point he forced her to drive him to a different location where he exited the vehicle. Despite the great divergence in Edmonds's actions after the sexual attacks on his victims, we held that joinder of the offenses was appropriate. Likewise, given the similarities of the attacks here, we do not find the differences in the geographical locations of the attacks dispositive.

The dissent contends that a modus operandi analysis is inappropriate here for another reason. The dissent appears to argue that other bad acts evidence should be inadmissible under the modus operandi exception where the other bad act is merely alleged. This would require the other bad act to be proven by a conviction. But this Court has never limited the modus operandi exception to applying only to the introduction of other bad-acts evidence that formed the basis of a criminal conviction. [25] Moreover, the dissent's understanding of modus operandi would categorically prevent its application to joinder of offenses for trial—two or more alleged strikingly similar crimes that satisfy the modus operandi exception could not be tried together on the basis of their mutual admissibility in separate trials. This would transform

22. *Id.* at 98.

23. *Id.* at 99.

24. 189 S.W.3d 558, 562–64 (Ky.2006).

25. *See, e.g., Anastasi v. Commonwealth,* 754 S.W.2d 860 (Ky.1988) (holding the trial judge did not abuse his discretion in admitting testi-

mony of an alleged uncharged rape eight years prior to trial and five years prior to the sexual abuse charged in the present trial); *see also* McCormick on Evidence, Ch. 17 § 190 ("[T]he fact that the defendant is guilty of another relevant crime need not be proved beyond a reasonable doubt.").

the practice of joinder of offenses.[26]

Admittedly, reasonable minds can differ on whether the two attacks are so strikingly similar as to demonstrate a modus operandi. But, as stated earlier, "a trial court has broad discretion with respect to joinder";[27] and "[a] conviction based on joinder of offenses should only be reversed if there is a clear showing of abuse of discretion and prejudice to the defendant."[28] We cannot say that the trial court here clearly abused its discretion by allowing these two incidents of rape to be tried in the same proceeding.

The dissent argues, without citing any authority, that a finding of mutual admissibility is not the end of the joinder analysis; rather, the Court should determine whether the defendant was unduly prejudiced despite the fact that evidence of both crimes would be mutually admissible in separate trials. This is a step never before taken by this Court.[29]

Even were we to undertake this extra analysis, Newcomb has failed to show undue prejudice by the joinder. Newcomb contends that the credibility of the complaining witnesses was unfairly bolstered by the joinder. Essentially, he claims the jury was more likely to find him guilty from the fact of multiple charges. But this prejudice is inherent in the joinder of all offenses and is not undue prejudice.

We also reject the dissent's contention that the Commonwealth's case that Newcomb raped Karen was weaker than the case that he raped Jennifer. In making this assertion, the dissent categorically rejects the proof put on by the Commonwealth, accepts the evidence presented by Newcomb, and determines as if its role is that of factfinder that the rape of Karen was implausible.

■ To the extent that the dissent would have the trial court, in ruling on joinder, first determine admissibility under KRE 404(b) and then proceed to the KRE 403 balancing test, we decline to require trial courts to make this finding explicitly on the record. We agree that a trial court should exclude evidence otherwise admissible under KRE 404(b) if its probative value is substantially outweighed by the danger of undue prejudice. In making this determination, "a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."[30] Many of these factors are inherent in the trial court's decision that the two allegations were so strikingly similar that they satisfied the modus operandi exception.

■ And we must keep in mind the difficulty of making a joinder determina-

---

26. *See, e.g., Edmonds v. Commonwealth,* 189 S.W.3d 558 (Ky.2006) (approving joinder of offenses against separate victims where the facts of each offense were strikingly similar).

27. *Rearick,* 858 S.W.2d at 187 (citation omitted).

28. *Chestnut,* 250 S.W.3d at 299–300 (citation omitted).

29. *See, e.g., Price v. Commonwealth,* 31 S.W.3d 885, 889 (Ky.2000) (citation omitted);

*Spencer v. Commonwealth,* 554 S.W.2d 355, 358 (Ky.1977) (holding that no prejudice to the defendant resulted from the trial court's refusal to grant separate trials of two separate rape charges because the evidence of either offense would have been admissible in a separate trial for the other).

30. McCormick on Evidence, Ch. 17 § 190 (citations omitted).

tion prior to trial. The trial court must decide whether joinder is appropriate before any evidence has been put on. Essentially, the trial judge must imagine that the charges are tried separately in order to determine whether evidence of the crimes would be mutually admissible. It is yet another step out into an imagined world to then ask the trial court to determine if the probative value of evidence admissible under KRE 404(b) would then substantially be outweighed by the risk of undue prejudice. Asking trial courts to make such a context-driven decision before trial has even begun puts them in an untenable position.

Given the probative value of the strikingly similar crimes, we cannot say that the prejudice to Newcomb was unreasonable or unnecessary. So the trial court did not abuse its discretion by joining the offenses where the evidence would have been mutually admissible in separate trials and Newcomb alleges only the type of prejudice attendant with all joinder of offenses.

We note the Commonwealth's representation to the trial court during pretrial hearings on the issue of joinder that the evidence at trial would show that Newcomb threatened to harm Jennifer because he knew that Karen reported him to the police two days earlier. The trial court seized upon this allegation as highly indicative of Newcomb's intent to rape the victims and determined that the facts surrounding the rapes and the intimidation of Jennifer were inextricably intertwined, making joinder of all offenses for trial appropriate.[31]

But the Commonwealth produced no evidence at trial tending to show that Newcomb was aware that Karen had reported the rape to the police at the time he threatened Jennifer. So the Commonwealth's representation in advance of trial proved to be mere conjecture, based purely upon the fact that Newcomb threatened Jennifer two days after Karen reported the rape to the authorities. Conjecture of this sort is not sufficient to support joinder of offenses for trial. If the two rape counts were tried separately, proof that Newcomb raped Karen would not be allowed in the trial for Jennifer's rape and intimidation based on the Commonwealth's conjecture. Conjecture alone does not inextricably intertwine the rape and intimidation counts.

At the close of the Commonwealth's case in the second trial, Newcomb moved for a mistrial based on the lack of evidence that he knew about Karen's report to the police when he allegedly threatened Jennifer. Having issued the opinion and order on the joinder issue nearly two years before the second trial, the trial court did not recall its previous ruling relying on the Commonwealth's conjecture regarding the instigating factor for Newcomb's intimidation of Jennifer. And the trial court orally ruled that the similarities between the two rapes were sufficient to support joinder of the offenses for trial based on the modus operandi exception to KRE 404(b). Because we cannot find that the court abused its discretion in this ruling, the Commonwealth's improper speculative theory does not compel us to reverse Newcomb's convictions. So we affirm the ruling of the trial court on this matter.

## III. THE TRIAL COURT PROPERLY DENIED NEWCOMB'S DIRECTED VERDICT MOTION.

Newcomb argues that he was entitled to a directed verdict on the rape

---

**31.** Under KRE 404(b)(2), other crimes evidence is admissible "[i]f so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party."

count regarding Jennifer. He claims the Commonwealth failed to present evidence of forcible compulsion at trial, as required under KRS 510.040(1)(a). When ruling on a directed verdict motion, the trial court must view the evidence in favor of the Commonwealth.[32] And questions of the credibility and weight of evidence are left to the jury.[33] A directed verdict must be denied if a reasonable juror could find the elements of the crime proven beyond a reasonable doubt.[34] On appellate review, "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."[35]

 This argument is not properly preserved for review because Newcomb did not state specific grounds for relief in his motion for a directed verdict before the trial court.[36] So we review the issue for palpable error under RCr 10.26.[37] If a palpable error has occurred, relief may be granted if the error resulted in manifest injustice.[38] Manifest injustice is found only if the error seriously affected the

"fairness, integrity, or public reputation of the proceeding."[39]

"A person is guilty of rape in the first degree when [h]e engages in sexual intercourse with another person by forcible compulsion[.]"[40] *Forcible compulsion* means "physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim" is not necessary to meet this definition.[41]

 In determining whether the victim felt threatened to engage in sex or feared harm from the attacker, a subjective test is applied.[42] Sufficient evidence of forcible compulsion is presented to the jury if, "[t]aking into consideration all of the circumstances, the jury could believe beyond a reasonable doubt that the [alleged victim] was terror-stricken at the time she submitted to [the defendant]."[43]

---

32. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

33. *Id.*

34. *Id.*

35. *Id.* (citations omitted).

36. To preserve a trial court's denial of a directed verdict for appellate review, a defendant must move for a directed verdict at the close of the Commonwealth's case and renew the motion at the conclusion of all the evidence. *Commonwealth v. Jones,* 283 S.W.3d 665, 669 (Ky.2009) (citations omitted). And a defendant "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove." *Id.* (citations omitted).

37. *Id.* at 668.

38. *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006).

39. *Id.* at 4 (citing *Johnson v. United States,* 520 U.S. 461, 462, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

40. KRS 510.040(1)(a).

41. KRS 510.010(2).

42. *See James v. Commonwealth,* 360 S.W.3d 189, 195 (Ky.2012) ("At the very least, this established [the victim's] subjective view that she had been threatened to engage in sex, which is sufficient to prove forcible compulsion.") (citing *Salsman v. Commonwealth,* 565 S.W.2d 638, 641 (Ky.App.1978) ("In determining whether the prosecutrix submitted to Salsman because of an implied threat which placed her in fear of immediate death or physical injury, a subjective rather than objective standard must be applied.")).

43. *Salsman,* 565 S.W.2d at 642; *see also James,* 360 S.W.3d at 196.

In *Salsman v. Commonwealth*,[44] the Kentucky Court of Appeals pointed to a number of factors that supplied sufficient evidence of forcible compulsion.[45]

> The [alleged victim] was mentally retarded. Because of her deafness, she had difficulty understanding communications from other persons. She was alone in the house. Salsman ignored her physical resistance to his efforts to perform an oral sex act upon her. He ignored her repeated indications that she did not wish to have sex with him. He physically pulled her from a chair. Salsman physically held the [alleged victim] while he removed her clothing.[46]

Similarly, several factors existed here from which the jury could determine that Newcomb forcibly compelled Jennifer to engage in sexual intercourse. According to the Commonwealth's proof, Newcomb appeared suddenly in Jennifer's home without invitation. Newcomb forced Jennifer to him and began kissing her neck. Jennifer rejected Newcomb's advances; but Newcomb ignored her objections, kept kissing her neck and said, "Don't push me away. You know you want me." Again, ignoring Jennifer's protests, Newcomb unfastened her belt. When Jennifer re-fastened her belt, he unbuckled it again. Jennifer testified that she then submitted to Newcomb's sexual advances out of fear and shock at Newcomb's actions.

The Commonwealth also presented evidence of the offense through the testimony of the physician who treated Jennifer after the attack. Jennifer told the doctor that she was at her house when a man kissed her neck against her objections and pulled her pants down. She pulled her pants back up and struggled with the man who kept pulling them down. She repeatedly protested and was crying when he forced himself upon her.

Based on the evidence presented at trial, the trial court properly submitted the question of forcible compulsion to the jury. In the light most favorable to the Commonwealth, the evidence showed that Newcomb used force by physically drawing Jennifer to him, kissing her neck, unfastening her belt, and physically pulling her pants down. Although physical resistance by the victim is not necessary, Jennifer did resist Newcomb by struggling with him to keep her belt fastened and her pants pulled up. Jennifer further testified that she submitted to Newcomb out of fear. Sufficient evidence existed for the jury to determine that Jennifer subjectively felt threatened to engage in sex or feared harm from Newcomb if she did not submit to his sexual advances. Newcomb was not entitled to a directed verdict because, under the evidence as a whole, it was not clearly unreasonable for the jury to find him guilty of raping Jennifer by forcible compulsion. No error occurred, let alone palpable error resulting in manifest injustice.

## IV. THE TRIAL COURT PROPERLY DENIED NEWCOMB'S *BATSON* MOTION.

Newcomb next claims that he was denied equal protection when the trial court denied his *Batson*[47] motion, in which

44. 565 S.W.2d 638 (Ky.App.1978).

45. *Salsman* was decided at a time when the statutory definition of forcible compulsion required evidence that the defendant overcame the victim's earnest resistance. Earnest resistance on the part of the victim is no longer required.

46. *Id.* at 641–42.

47. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

he objected to the Commonwealth's use of a peremptory strike to remove the only African American from the jury panel.

During voir dire, Juror A revealed that he was acquainted with several potential witnesses through his work as director of a community center. Jordan Summers was listed as a potential witness for both the Commonwealth and Newcomb.[48] Summers was active at Juror A's community center, and he was the juror's cousin. The two communicated on a regular basis, and Juror A told the trial court that he could not be neutral if Summers testified because he considered Summers an honest person. Juror A had also attended high school with a detective listed as a trial witness for the Commonwealth; and he knew two other potential witnesses for Newcomb, Daybraun and Vontimius Fields, from the community center.[49]

Newcomb did not want the trial court to strike Juror A for cause. So he informed the trial court that he would forego calling Summers to testify, leaving Summers as only a potential witness for the Commonwealth in rebuttal on a tangential issue. The other witnesses listed for Newcomb with whom Juror A was acquainted were not under subpoena, and Newcomb did not anticipate calling them to testify at trial. Despite expressing concerns over Summers's familiarity with potential witnesses, the trial court ultimately deferred to Newcomb's wishes and did not strike the juror for cause.

The Commonwealth used a peremptory strike to remove Juror A from the jury. Newcomb objected to Juror A's removal, claiming it was based on racial discrimination in violation of his equal-protection rights. The trial court stated the juror was obviously uncomfortable with sitting on Newcomb's case because of his familiarity and ongoing relationship with several of the witnesses. And Juror A indicated that he could not remain neutral regarding at least one potential witness. So the trial court denied Newcomb's *Batson* challenge to the Commonwealth's removal of Juror A from the jury.

 A *Batson* motion claiming racial discrimination in jury selection involves a three-prong inquiry.

First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Second, once a prima facie showing is made, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Finally, the trial court must then determine if the defendant has established purposeful discrimination.[50]

"[T]he ultimate burden of showing unlawful discrimination rests with the challenger." [51] Great deference is given to the trial court's ruling on a *Batson* motion, and we will not overturn the ruling absent clear error.[52]

 The first and second prongs of the *Batson* test are satisfied here. The

---

48. Summers actually testified for Newcomb in the first trial. But following the first trial, his story apparently changed; and he was listed as a potential witness for both the Commonwealth and Newcomb. If he testified, the Commonwealth anticipated Newcomb would impeach him with his testimony from the first trial.

49. Daybraun Fields also testified for Newcomb in his first trial.

50. *Blane v. Commonwealth*, 364 S.W.3d 140, 148–49 (Ky.2012) (citations and internal quotations omitted).

51. *Rodgers v. Commonwealth*, 285 S.W.3d 740, 758 (Ky.2009) (citation omitted).

52. *Mash v. Commonwealth*, 376 S.W.3d 548, 555 (Ky.2012) (citation omitted).

Commonwealth proffered an explanation for the peremptory strike against Juror A. So we need not determine whether Newcomb satisfied the first prong of the *Batson* test.[53] Under the second prong, the Commonwealth must present a race-neutral explanation for striking the African American juror. "This step sets a fairly low bar for the Commonwealth to meet. '[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.' "[54] The prosecutor struck Juror A out of concern that the juror could not remain neutral in deciding Newcomb's case. This reason for striking Juror A meets the facial validity requirement under *Batson* because it could apply to a juror of any race.

■■■ Newcomb claims the Commonwealth's peremptory strike fails under prong 2 of the *Batson* analysis because Juror A displayed a potential bias in favor of, not against, the Commonwealth. But it is not so clear that the juror's bias would work in the Commonwealth's favor. Summers testified for Newcomb in his first trial. If Summers took the stand for the Commonwealth in his second trial, Newcomb presumably would impeach him with his prior trial testimony. As noted by the Commonwealth, the presence of Juror A on the panel raised a host of issues because no one could speculate how the juror's bias would inform his opinion in such a situation. Although this speculation may not have supported a strike for cause by the Commonwealth, the prosecutor's race-neutral explanation under *Batson* does not "have to rise to a level sufficient to satisfy a strike for cause."[55]

■■■ We also reject any contention that an otherwise race-neutral explanation proffered by the Commonwealth is categorically inadequate when the juror displays bias in favor of the Commonwealth. "[T]he United States Supreme Court [has] rejected outright the notion that certain race-neutral explanations are always pretextual or inadequate[.]"[56] This includes an explanation based on a juror's bias in favor of the Commonwealth. The Commonwealth can legitimately strike a juror out of a desire to avoid a potentially fatal error in trial. And it is within the trial court's discretion to determine whether the Commonwealth's use of a peremptory strike on a juror that potentially favors the Commonwealth is legitimate or pretext for racial discrimination.

The present holding is consistent with our precedent. We upheld a trial court's *Batson* ruling where "[t]he prosecutor stated that he did not know if the strike was good or bad for the Commonwealth because Juror C had given statements favorable to the Commonwealth, but that he did not want to take a chance on the situation."[57] Likewise, in *Stanford v.*

**53.** *Commonwealth v. Snodgrass,* 831 S.W.2d 176, 179 (Ky.1992) (citation omitted) ("[S]ince the prosecutor offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate issue of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing also becomes moot.").

**54.** *Mash,* 376 S.W.3d at 555 (citing *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)).

**55.** *Snodgrass,* 831 S.W.2d at 179 (citation omitted).

**56.** *Thomas v. Commonwealth,* 153 S.W.3d 772, 777 (Ky.2004) (citing *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).

**57.** *France v. Commonwealth,* 320 S.W.3d 60, 68 (Ky.2010).

*Commonwealth,*[58] we upheld the trial court's denial of a defendant's *Batson* motion in a murder trial where the Commonwealth struck a juror whose cousin had been murdered. The Court rejected "appellant's speculation that such a juror would likely be more favorable to the prosecution than to the defense."[59] So even if Juror A's bias was in favor of the Commonwealth, the prosecutor's race-neutral explanation regarding Juror A's neutrality meets the second prong of the *Batson* analysis.

■■■ Newcomb has not carried his burden under the third prong of the *Batson* test to show purposeful discrimination by the Commonwealth. At this step of the analysis, appellate courts should defer to the trial court absent exceptional circumstances.[60] "Because the trial court's decision on this point requires it to assess the credibility and demeanor of the attorneys before it, the trial court's ultimate decision on a *Batson* challenge is like a finding of fact that must be given great deference by an appellate court."[61] The trial court acted within its discretion in finding that the Commonwealth's race-neutral explanation for striking Juror A was not a pretext for racial discrimination.

Newcomb argues the trial court erred because it was unlikely that the witnesses with whom Juror A was acquainted would be called to testify. The Commonwealth planned to call Summers only to rebut the testimony of defense witness Daybraun Fields. Newcomb informed the trial court that he did not expect to call Fields to testify, so the Commonwealth would have no reason to call Summers in rebuttal.[62]

We cannot find the trial court's decision here was clearly erroneous. Regardless of Newcomb's assertions about which witnesses would actually testify at trial and who was subpoenaed, all were listed as potential witnesses. While Newcomb did not place the witnesses under subpoena, Summers was under subpoena by the Commonwealth. And, as explained above, it is unclear whether Juror A's bias would work in favor of or against the Commonwealth if Summers testified and Newcomb impeached him. The trial court assessed the Commonwealth's race-neutral explanation and found it credible. And the trial court noted Juror A's discomfort with the case because of his ongoing relationship with the potential witnesses. Given the juror's position at the community center, the trial court determined that sitting on Newcomb's case would put Juror A in an untenable position. The trial court did not clearly err in determining that the Commonwealth's peremptory strike was not based on racial discrimination.

## V. THE TRIAL COURT DID NOT VIOLATE NEWCOMB'S CONSTITUTIONAL RIGHTS BY EXCLUDING EVIDENCE AND LIMITING CROSS–EXAMINATION.

Newcomb argues that the trial court improperly prohibited him from introducing evidence necessary to his defense and erroneously limited the scope of cross-examination pertaining to his defense. In a statement to police, Jennifer reported that her grandfather was prejudiced against African Americans and her stepfather was beaten up by a gang of African Americans.

---

58. 793 S.W.2d 112, 114 (Ky.1990).

59. *Id.*

60. *Mash,* 376 S.W.3d at 556 (citation omitted).

61. *Commonwealth v. Coker,* 241 S.W.3d 305, 308 (Ky.2007) (citations omitted).

62. Ultimately, neither witness was called at Newcomb's trial.

Before Newcomb's first trial, the trial court granted the Commonwealth's motion in limine to prevent the defense from referencing the fact that anyone in Jennifer's family, other than Jennifer, may have racist views. And, at trial, the trial court did not allow Newcomb to inquire into the racist views of Jennifer's family but did allow him to ask an investigator whether Jennifer gave other reasons for not reporting the attack, without explaining the specific reasons. When cross-examined on this point, the investigator testified that Jennifer also reported family ridicule as a reason for not reporting her rape right away.

■■■ Newcomb now argues that the trial court erroneously granted the Commonwealth's motion in limine and improperly limited the scope of cross-examination on the racist views of Jennifer's family. He claims that this evidence was necessary to his defense to the charges of rape and intimidating a participant in a legal proceeding because it was proof that Jennifer did not delay her report to the police because Newcomb threatened her but because she was afraid of being confronted by her allegedly racist family members when they learned she had consensual sexual intercourse with an African–American man. Accordingly, he contends that the trial court violated his constitutional right to present a complete defense.

We review Newcomb's claims for palpable error because they are not properly preserved for appellate review. When opposing the Commonwealth's motion in limine, Newcomb did not argue to the trial court that exposing the prejudiced views of Jennifer's family was essential to his defense on the rape and intimidation charges. He merely claimed the topic was proper for cross-examination because Jennifer's racial bias could be inferred from the fact that she reported her family members' racial biases to the police. The trial court rejected this leap of logic and found the racist views of Jennifer's family irrelevant to Jennifer's bias.

And, at trial, Newcomb did not object to the limitation the trial court placed on his cross-examination of the detective. At a bench conference, Newcomb asked the trial court whether he could cross-examine the testifying investigator about the racist views of Jennifer's family.[63] The trial court's earlier ruling on the Commonwealth's motion in limine was still in place. And a discussion ensued at the bench regarding the limits of cross-examination in light of the ruling in limine. Newcomb proposed a compromise and asked if he could inquire into whether Jennifer gave other reasons for delaying complaint to the police without going into the details of those reasons. The trial court agreed, and Newcomb proceeded accordingly. Again, Newcomb never argued to the trial court that his right to present a complete defense entitled him to cross-examine the witness on the racial biases of Jennifer's family. Because the trial court was not presented an opportunity to rule on the arguments Newcomb raises on appeal, we treat them as unpreserved for appeal. We cannot say that palpable error occurred here.

■■■■ Under the United States Constitution and the Kentucky Constitution, an accused has a right to present a com-

63. He claimed that through its questioning of several witnesses the Commonwealth presented evidence that Jennifer delayed reporting her alleged rape because she was scared. The Commonwealth wanted the jury to infer that Jennifer was scared of Newcomb. According to Newcomb, this opened the door to questions concerning any other reasons why Jennifer may have delayed reporting the attack.

plete and meaningful defense.[64] "An exclusion of evidence will almost invariably be declared unconstitutional when it significantly undermine[s] fundamental elements of the defendant's defense."[65] But the right to present a defense does not

> abrogate the rules of evidence.... [T]he defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or disproportionate to the state's legitimate interest must the rule bow to the defendant's right.[66]

When exclusion of evidence does not significantly undermine fundamental elements of the defendant's defense, a trial court has the discretion to exclude evidence to ensure the fairness of a trial; and "its determination will not be overturned on appeal in the absence of a showing of an abuse of such discretion."[67]

 The right to cross-examine witnesses is also "[a]n essential aspect of the Sixth Amendment Confrontation Clause...."[68] But that right "is not absolute[,] and the trial court retains the discretion to set limitations on the scope and subject ..." of cross-examination.[69] The Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[70] And trial courts have broad discretion "to impose reason-

able limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant."[71]

 We cannot find that the alleged racial bias of Jennifer's family was a fundamental element of Newcomb's defense such that the trial court's ruling in limine erroneously excluded that evidence from trial. At the hearing on the Commonwealth's motion in limine, Newcomb's counsel did not assert that the evidence was part of Newcomb's defense to the charges. He sought only to use the evidence to attack Jennifer's credibility on cross-examination regarding her own bias. The trial court properly ruled that the racial bias of Jennifer's family is irrelevant to Jennifer's racial bias. Just because Jennifer reported her family members' biases to the authorities does not mean that Jennifer herself was biased against African Americans. Given Newcomb's arguments to the trial court, we can find no fault in the trial court's ruling to exclude evidence that Jennifer's grandfather and stepfather were prejudiced against African Americans. Newcomb chose not to pursue the potential defense that Jennifer fabricated the rape and intimidation charges because she was afraid her allegedly racist family would discover she had consensual sex with him.[72] He cannot now claim that the

---

64. *Brown v. Commonwealth*, 313 S.W.3d 577, 624–25 (Ky.2010) (citations omitted).

65. *Beaty v. Commonwealth*, 125 S.W.3d 196, 206–07 (Ky.2003) (citation and internal quotation omitted).

66. *McPherson v. Commonwealth*, 360 S.W.3d 207, 214 (Ky.2012) (citations omitted).

67. *Mullins v. Commonwealth*, 956 S.W.2d 210, 213 (Ky.1997) (citation omitted).

68. *Davenport v. Commonwealth*, 177 S.W.3d 763, 767 (Ky.2005) (citation omitted).

69. *Id.* at 768 (citation omitted).

70. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citation and internal quotation omitted).

71. *Id.*

72. Newcomb did mention in closing argument that Jennifer had many reasons to be

trial court violated his right to present a defense that he did not assert in the pre-trial hearing.

Moreover, Newcomb was allowed to elicit testimony from the investigator that Jennifer reported family scorn as a reason for her delayed reporting of the rape. He was able to present evidence pertinent to Jennifer's reason for delayed reporting. And Newcomb was satisfied with this compromise, as evidenced by his lack of a contemporaneous objection. So we find no manifest injustice in Newcomb's trial.

██ We also find that the trial court imposed a reasonable limitation on Newcomb's cross-examination of the detective to prevent prejudice and confusion of the issues. The detective's testimony that Jennifer cited family scorn as a reason for her delayed reporting conveyed the essential information to the jury. Although not explicitly stated by the trial court (because Newcomb did not actually object to the trial court's ruling), it was within the trial court's discretion to determine that the additional information that the family disapproval stemming from racial prejudice would only confuse the issues before the jury. The trial court did not violate Newcomb's Sixth Amendment rights by limiting his cross-examination of the detective.

## VI. THE PROSECUTOR'S VOIR DIRE QUESTIONS AND CLOSING ARGUMENT DID NOT RESULT IN PALPABLE ERROR.

██ Newcomb takes issue with the prosecutor's voir dire questioning and closing argument. He claims the prosecutor asked the jury to commit themselves to a particular view of the nature of the crime

of rape during voir dire questioning and that during closing argument, the prosecutor improperly testified and misled the jury. We review these unpreserved issues for palpable error.

### A. Any Error in the Prosecutor's Voir Dire Questioning did not Rise to the Level of Palpable Error.

██ During voir dire, the prosecutor engaged in a series of questions regarding rape. Newcomb argues that the following questions by the prosecutor were improper: "Do you agree that rape is a crime of violence, a particularly ugly crime; it's about power; it's about control; it's about dominating the victim; it's about humiliating the victim? Does everybody agree with me?" Newcomb contends that the prosecutor asked the jury to commit themselves to a particular view of the nature of the crime of rape, vilified Newcomb, and engendered sympathy for the victims.

██ Trial courts have broad discretion in jury questioning on voir dire.[73] The purpose of voir dire questioning is "to obtain a fair and impartial jury whose minds are free and clear from all interest, bias[,] or prejudice [that] might prevent their finding a just and true verdict."[74] And "questions are not competent when their evident purpose is to have jurors indicate in advance or commit themselves to certain ideas and views upon final submission of the case to them."[75]

The prosecutor's statements here may skirt close to the line of impermissible voir dire questioning. At first blush, it appears the questions were meant to invite jurors to commit to a view of the crime of rape.

ashamed of having consensual sex with Newcomb, including family ridicule.

**73.** *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky.1985).

**74.** *Id.*

**75.** *Id.* (citation omitted).

But several reasons lead us to hold that the questions were appropriate; and if error did occur, it did not rise to the level of palpable error.

The Commonwealth's questions regarding the crime of rape differ from voir dire questions we have previously held inappropriate. In *Ward v. Commonwealth*,[76] the Court found that the trial court did not abuse its discretion by not allowing the defendant to ask jurors if they could consider a deal made between a witness in the case and the Commonwealth in assessing a witness's credibility. The defendant "went so far as to say to the jury, You have a right as a jury, if you are selected as a juror, to hold those deals against the Commonwealth.'"[77] And, in *Woodall v. Commonwealth*,[78] the Court held the trial court did not abuse its discretion by limiting the defendant's voir dire questioning on mitigating circumstances. "Woodall was trying to get jurors to indicate in advance what their views were regarding his I.Q. of 74. He was seeking to oblige jurors to commit themselves by either accepting a specific mitigator or rejecting it before any evidence was heard."[79]

In both *Ward* and *Woodall*, the voir dire questions directly implicated the proof that would be put on at trial. The defendant in *Ward* asked jurors to determine that the testimony of a witness for the Commonwealth is less credible because the witness made a deal with the Commonwealth in exchange for testifying. And, in *Woodall*, the defendant tried to commit jurors to either accepting or rejecting the view that his I.Q. of 74 was a mitigating factor.

In the present case, the prosecutor was not trying to get jurors to commit to any idea of the specific evidence that would be presented at trial. Whether the jurors view rape as a particularly ugly crime that is about power, control, and dominating and humiliating the victim, does not affect their view of the witnesses' credibility or their finding of the statutory elements of rape. The Commonwealth did not ask the jurors to commit in advance to a view that would govern upon final submission of the case. So the prosecutor's voir dire questioning was not improper.

Even if error did occur during voir dire, it did not rise to the level of palpable error. The questioning was rather temperate. The prosecutor did not question individual jurors on their views of the crime of rape, nor did he require jurors to respond to his questions by raising hands. And Newcomb's counsel, while questioning the jury in voir dire, agreed with the prosecutor that rape is a very serious crime. In fact, defense counsel stated that short of murder, rape is the most serious crime with which a person can be charged. He repeated in his opening statement that rape was the most heinous crime short of murder. So, in light of the prosecutor's temperate questioning and the analogous comments made by Newcomb's counsel, any error committed did not result in manifest injustice.

## B. The Prosecutor's Closing Argument was not Improper.

During the prosecutor's closing argument, he described a pamphlet that he picked up at a local police station. The pamphlet described rape as a crime of violence that is about dominating and humiliating the victim. The prosecutor averred that there is nothing for a rape victim to be embarrassed or ashamed

76. 695 S.W.2d 404 (Ky.1985).

77. *Id.* at 407.

78. 63 S.W.3d 104 (Ky.2001).

79. *Id.* at 116.

about, and she should report the crime. He also asserted that Jennifer was probably not present to testify at trial because she was scared; Newcomb had threatened to harm her if she accused him of rape, and she had probably been threatened again. Newcomb claims the prosecutor's closing argument consisted of improper expert testimony, engendered sympathy for the victim, and misled the jury, violating his right to confrontation and a fair trial. We disagree.

Essentially, Newcomb claims the prosecutor engaged in misconduct. "To warrant reversal, misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair."[80] Prosecutors are allowed great latitude in opening statements and closing arguments, which are not evidence.[81] And the Court will

> reverse for prosecutorial misconduct in a closing argument only if the misconduct is "flagrant" *or* if each of the following three conditions is satisfied:
> 1) Proof of defendant's guilt is not overwhelming;
> 2) Defense counsel objected; and
> 3) The trial court failed to cure the error with a sufficient admonishment to the jury.[82]

Because Newcomb did not make a contemporaneous objection at trial, we review the Commonwealth's closing argument for flagrant misconduct and we find none.

The prosecutor's statements concerning the crime of rape did not engender sympathy for Karen and Jennifer nor vilify Newcomb. The cases Newcomb cites involve impermissible glorification of the victim that "pressure[s] the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability[.]"[83] The prosecutor in *Dean v. Commonwealth*[84] impermissibly described the victim in closing argument as an attractive, happily married housewife who was active in community affairs and attended church each Sunday. And *Benge v. Commonwealth*[85] involved the erroneous admission of evidence that the victim did not drink, regularly attended church, and sang in meetings, which improperly glorified the victim.

The prosecutor's closing argument did not glorify Karen or Jennifer and did not vilify Newcomb. The comments merely addressed the seriousness of the crime of rape. The Commonwealth "may legitimately argue that a crime is a serious one and should carry a heavy penalty."[86] The prosecutor's closing argument in *Lynem v. Commonwealth*[87] also spoke to the seriousness of the charged crime. The prosecutor stated,

> And this crime deserves more than the minimum punishment, Ladies and Gentlemen, for the simple reason that there is not a more potentially dangerous crime than that of armed robbery. If

**80.** *Butcher v. Commonwealth*, 96 S.W.3d 3, 12 (Ky.2002) (citation omitted).

**81.** *Id.* (citations omitted).

**82.** *Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky.2006) (citations omitted).

**83.** *Dean v. Commonwealth*, 777 S.W.2d 900, 904 (Ky.1989), *overruled on other grounds by Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky.2003).

**84.** *Id.*

**85.** 265 Ky. 503, 97 S.W.2d 54, 56 (1936).

**86.** *Harness v. Commonwealth*, 475 S.W.2d 485, 489–90 (Ky.1971).

**87.** 565 S.W.2d 141 (Ky.1978).

somebody moved the wrong way or if some innocent walked in [and] spoofed them, it wouldn't be a robbery here before you; it would be a murder. And for that potential danger, it deserves the maximum.[88]

The Court held that these statements did not "constitute the giving of material testimony by the prosecutor such as to be a violation of the right to confrontation nor were the remarks an appeal to prejudice."[89]

Here, the Commonwealth's comments in closing argument are within the reasonable latitude prosecutors are granted to persuade jurors the matter should not be dealt with lightly. And the prosecutor's reference to a pamphlet he read from a local police station was anecdotal, not the giving of material testimony. So we find meritless Newcomb's argument that the prosecutor's closing argument engendered sympathy for the victims, vilified him, and introduced expert testimony.

 We also reject Newcomb's argument that the prosecutor improperly misled the jury into believing that Newcomb threatened Jennifer after the first trial. It is true that attorneys cannot "argue facts that are not in evidence or rea-sonably inferable from the evidence."[90] But they are "entitled to draw reasonable inferences from the evidence, as well as respond to matters raised by the defense."[91] Here, the Commonwealth was responding to Newcomb's closing argument in which he claimed Jennifer did not testify at trial because she fabricated the charges and did not want to commit further perjury. The prosecutor was well within its bounds to respond by inferring a different reason for Jennifer's absence. So we hold that the prosecutor's voir dire questioning and closing argument were proper; and if error did occur, it did not rise to the level of palpable error.

## VII. THE PAROLE RESTRICTIONS OF THE VIOLENT OFFENDER STATUTE APPLY TO NEWCOMB.

Newcomb was 17 years old at the time he committed the crimes at issue, and he was tried in circuit court as a youthful offender.[92] But, at the time he was sentenced, Newcomb was nearly 20 years old and had essentially aged out of the youthful offender sentencing scheme. Before being sentenced, Newcomb moved the trial court not to designate him as a violent offender in the final judgment, citing *Commonwealth v. Merriman.*[93] The trial court

88. *Id.* at 144.

89. *Id.*

90. *Garrett v. Commonwealth*, 48 S.W.3d 6, 16 (Ky.2001) (citations omitted).

91. *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky.2005) (citations omitted).

92. The minor's age at the time he allegedly commits an offense governs whether he can be tried as a youthful offender. *See, e.g.,* KRS 635.020(2) ("If a child charged with a capital offense, Class A felony, or Class B felony, had attained age fourteen (14) at the time of the alleged commission of the offense....").

93. 265 S.W.3d 196 (Ky.2008). At the hearing on this issue, the trial court questioned whether the violent offender designation should be made by the trial court or the Department of Corrections (DOC) after incarceration. The circuit court accepted Newcomb's argument that the final judgment must designate defendants as violent offenders. Typically, the DOC is in charge of classifying inmates as violent offenders for purposes of parole. If the inmate takes issue with the classification, he must file an action against the DOC rather than argue the issue in his direct appeal. *See Mason v. Commonwealth*, 331 S.W.3d 610, 628–29 (Ky.2011). The trial court designates in its judgment if the victim suffered death or serious physical injury and determines whether the defendant was a victim of domestic violence or abuse. KRS 439.3401(1) and (5). The Kentucky

found that *Merriman* was not applicable to Newcomb and classified him as a violent offender.

Violent offenders convicted of a capital offense or a Class A or B felony are not eligible for probation or parole until they have served at least 85 percent of their sentence of incarceration.[94] Violent offenders also cannot receive certain sentencing credit.[95] In *Merriman*, this Court held that a youthful offender cannot be designated a violent offender for purposes of probation and conditional discharge at the time of the offender's 18 year-old-hearing.[96]

Newcomb argues that under *Merriman*, the Violent Offender Statute cannot apply to youthful offenders for any purpose, so he should not be subject to its parole eligibility constraints. But, in *Edwards v. Harrod*,[97] a case we rendered recently, we make clear that the holding of *Merriman* is limited to a youthful offender's eligibility for probation and is not applicable to the parole eligibility restrictions of the Violent Offender Statute. The General Assembly intended to subject individuals who are both youthful offenders and violent offenders to the parole eligibility constraints of the Violent Offender Statute.[98]

Equal protection concerns are not at issue here, contrary to Newcomb's claim. The Violent Offender Statute's parole eligibility restrictions are not only applied to youthful offenders who are over the age of 18 years, 5 months at the time they are sentenced. The restrictions apply to all youthful offenders, regardless of their age at the time of sentencing. So we affirm the trial court's ruling that the parole eligibility constraints of the Violent Offender Statute apply to Newcomb.

## VIII. CONCLUSION.

Having carefully reviewed the record and the issues raised by Newcomb, we find no error. Consequently, we find no cumulative error requiring a new trial, the final issue Newcomb asserts on appeal. We affirm the final judgment and sentence imposed by the trial court.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ., sitting. ABRAMSON, NOBLE, and SCOTT, JJ., concur. CUNNINGHAM, J., dissents by separate opinion in which VENTERS, J., joins. VENTERS, J., dissents by separate opinion in which CUNNINGHAM, J., joins. KELLER, J., not sitting.

CUNNINGHAM, J., dissenting:

With all due respect to the majority, I cannot imagine a more prejudicial joinder of offenses for trial than in this case. Therefore, I must respectfully dissent.

The alleged victim of the first rape, Karen, and the Appellant were both 17–year-olds working at Burger King. The evidence related that she voluntarily gave him a

---

Court of Appeals has held that trial courts can make only these factual determinations and cannot classify a defendant as a violent offender. *Hoskins v. Commonwealth*, 158 S.W.3d 214, 216–17 (Ky.App.2005); *Jones v. Commonwealth*, Nos. 2008–CA–001142–MR, 2008–CA–001143–MR, 2010 WL 4278118 at *1–2 (Ky.App.2010). This issue is not raised by Newcomb or the Commonwealth, and we do not address it today.

94. KRS 439.3401(3).

95. KRS 439.3401(4).

96. *Merriman*, 265 S.W.3d at 201.

97. *Edwards v. Harrod*, 391 S.W.3d 755 (Ky. 2013).

98. *Id.*

ride home on the evening of the incident. Instead of going to his house, she voluntarily drove the Appellant to a parking lot some distance from his home, even though her mother had instructed her to come straight home after taking the Appellant home.

The victim then testified that when she stopped the car in a parking lot a distance from any nearby building, the motor was cut off and he grabbed the keys from the ignition. According to the victim, he then grabbed her by the hair, pulled her over into the passenger side, unbuckled and pulled down his pants with one hand, and had sex with her against her will. There is no evidence of any resistance on behalf of the victim by way of scratches or bruises to her face or that of the Appellant. In fact, the victim admitted not offering any physical resistance. She simply said she "froze." The victim insisted in her testimony that she was unafraid and never felt threatened, even by the Appellant's initial advances in the car. The victim is not a small person. Neither is the Appellant particularly big. Although the victim denied any romantic involvement with the Appellant, one co-worker testified that he had previously seen the two of them in the drive-through of the Burger King together. Prior to the alleged rape, they were sitting close together and either kissing or whispering into each other's ears.

With upmost respect to the victim of this case, it is obvious that the prosecution of this charge by itself would be problematic. It is a "he said-she said" encounter between 17–year–olds in the victim's mother's car. The details of this alleged forcible sexual act—considering all the circumstances—are implausible. This is not to mention the evidence of the two being seen in a close physical encounter in a car previous to the alleged sexual assault.

However, when much more plausible evidence of the second sexual assault on Jennifer in her living room ten days later is introduced, all doubts about the guilt of the Appellant in the first encounter with the 17–year–old coworker disappear. Add to this the highly aggravating evidence of the Appellant threatening the victim of the second rape a few days after the assault. The jury heard that two days after the second rape, the Appellant brought several friends to the victim's home and threatened her if she reported the rape. It scared the victim so bad that she went and lived with a friend.

None of this damning evidence, nor the charges of trespass and intimidating a witness in a legal proceeding, would have come into evidence in the trial of the first rape alone. It is important to point out in passing that there were actually three additional charges attending to the second rape. The Appellant was charged with intimidating a participant in a legal proceeding, second-degree burglary, and unlawful imprisonment. Either the judge directed a verdict or the jury found the Appellant not guilty of the latter two. All of this piling on as to the second rape only adds to the prejudice of trying the rape charges together. It is significant to point out that even with the highly prejudicial trial for the various charges jointly, the jury was unable to reach a verdict in the first trial and a mistrial had to be declared.

We seem to ignore in this case a very important provision of RCr 9.16 which says "[i]f it appears that a defendant ... *will be prejudiced* by a joinder of offenses ... for trial, the court shall order separate trials of counts ... or provide whatever other relief justice requires." (Emphasis added.)

Here, we have two separate rape charges, intimidating a witness in a legal proceeding, and trespass separated by ten

days and varying circumstances all tried together. Given the fact that it took the jury two trials to convict the Appellant with the charges being joined, it is highly likely that the Appellant would not have been convicted of the first rape had the charges been tried separately.

I, therefore, must dissent and would reverse and remand for a new trial.

VENTERS, J., joins.

VENTERS, J., dissenting:

I respectfully dissent because the Majority's rationale for allowing joinder of the two rape charges is unsound. Not only does the Majority improperly analyze the prejudicial effect of joinder, but it also misapplies the *modus operandi* theory to allow as evidence of other bad acts under KRE 404(b), two allegations of rape, each one admitted into evidence as proof that the other occurred.

## I. THE MAJORITY OPINION FAILS TO FULLY CONSIDER THE PREJUDICIAL EFFECT OF JOINDER IN THIS CASE

First, quoting from *Rearick v. Commonwealth*, 858 S.W.2d 185 (Ky.1993), the Majority recognizes that "the extent to which one offense is admissible in the trial of the other" is a "substantial factor" in identifying whether a joint trial is prejudicial. I agree with that. However, upon reaching its conclusion that each rape allegation would be admissible in a separate trial of the other, the Majority's analysis ends. No further consideration of possible prejudice was made. *Rearick* should be the beginning of the analysis, not the end of it. As a result, what was once just a "substantial factor" in "identifying" prejudice (or the lack thereof), is now an irrebuttable presumption that no prejudice exists. That holding short-circuits the analysis. I see nothing to indicate that the trial court

or the Majority has overtly considered the prejudicial effect of this joinder.

The Majority tacitly rewrites *Rearick* and errs by stating that "KRE 404(b) *controls* the admission of a defendant's prior bad acts into evidence at trial." (emphasis added). KRE 404(b) may *permit* the admission of certain evidence, but not all such evidence actually gains admission at trial. Even admissible evidence must be "excluded if its probative value is substantially outweighed by the danger of undue prejudice." KRE 403. We cannot properly evade the fairness analysis that must be undertaken, including whether the otherwise admissible evidence should be excluded because of unfair prejudice.

Upon a full analysis of the prejudicial effect of joinder, I am in agreement with Justice Cunningham that joinder should not have been allowed. But my dissent is also grounded upon a more fundamental base: the Majority's distortion of the "*modus operandi*" exception to allow the introduction of other bad acts under KRE 404(b).

## II. DISTORTION OF THE "*MODUS OPERANDI*" EXCEPTION TO KRE 404(B)

The Majority justifies the joinder of Karen's allegation of rape and Jennifer's allegation of rape into one trial on the grounds that, if tried separately, each of the alleged rapes would have been admissible as evidence in the trial of the other. That proposition is based upon two flaws. First is the flawed conception that KRE 404(b) allows the admission of "*modus operandi*" evidence to "prove the *corpus delicti, i.e.* that the offense, in fact, occurred." Second is the flawed logic of the argument that Karen's accusation makes Jennifer's allegation more believable, and in turn, Jennifer's accusation makes Kar-

en's allegation more believable. It is one thing to prove an unknown allegation by its similarity to one that has been proven or is not in dispute. But here, each unproven allegation—the alleged rape of Jennifer and the alleged rape of Karen—is allowed to serve as the "strikingly similar" act that proves the other.

### C. The fallacy of *"modus operandi* to prove *corpus delicti"*

KRE 404(b) and its ancient common law ancestor prohibit admission of evidence of other crimes, wrongs, or acts to prove the character of the accused to show action in conformity therewith. The so-called *"modus operandi* to prove *corpus delicti"* exception to KRE 404(b) permits precisely the kind of faulty evidence that the traditional rule and KRE 404 were devised to prevent. A concise statement of the traditional rule of evidence relating to the admission of evidence of other crimes and bad acts that developed in the common law may be found in *Romes v. Commonwealth,* 164 Ky. 334, 175 S.W. 669, 670–71 (1915):

> Indeed, the rule that evidence of other crimes is not competent, except in a few cases, obtains everywhere. It has received the approval of all courts and all judges, and is so manifestly correct that it needs no argument to sustain it. Every person who is put upon his trial for an offense selected by the commonwealth has the right to assume that he will be tried for the particular offense charged against him, and that his rights will not be prejudiced by evidence of other independent and disconnected acts of wrongdoing, for each of which he may be compelled to answer in a prosecution

instituted for that purpose. *There are, however, a few exceptions to this general rule applicable to cases in which it is necessary to establish identity, or guilty knowledge, or intent, or motive for the commission of the crime under trial, or when other offenses are so interwoven with the one being tried that they cannot well be separated from it in the introduction of relevant and competent testimony, or when the independent offense was perpetrated to conceal the crime for which the accused is on trial.*

(emphasis added) (citation omitted); *see also Music v. Commonwealth,* 186 Ky. 45, 216 S.W. 116, 119 (1919) ("The general rule existing without exception in criminal practice, is that evidence of other crimes is competent to show identity, guilty knowledge, intent, or motive, and the evidence may also be admitted where the offense charged is so interwoven with other offenses that they cannot be separated."). It is readily apparent that these articulations of the rule are virtually identical to KRE 404(b). *Chumbler v. Commonwealth,* 905 S.W.2d 488, 494 (Ky.1995) provides a clear, modern statement of the rule *after* the adoption of the Kentucky Rules of Evidence.[99]

The so-called *"modus operandi* to prove *corpus delicti"* exception is a relatively recent addendum to the traditional rule. Stripped of its Latin obfuscation, this modern deviation of the rule is simply another way of saying, "We know that what happened was a crime because the defendant did the same kind of thing before." It presumes that we can show that *this* act was a rape (and not consensual sex) because the defendant has established a pro-

---

**99.** *Chumbler* says: "Evidence of other crimes or wrongful acts may be introduced as an exception to the rule to show proof of motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident. KRE 404(b)(1). To be admissible under any of these exceptions, the acts must be relevant for some purpose other than to prove criminal predisposition; sufficiently probative to warrant introduction; and the probative value must outweigh the potential for undue prejudice to the accused." *Id.* at 494.

pensity to rape; *i.e.,* he is the kind of person who commits rape. That concept runs contrary to the whole purpose and thrust of KRE 404.

To be clear, *"modus operandi,"* when properly applied, retains an important place in 404(b) analysis, just as we recently explained in *Graves v. Commonwealth,* 384 S.W.3d 144, 149 (Ky.2012). But its proper application is contingent upon its ability to establish a logical connection between a known evidentiary fact and the unknown fact to be proven *other than* its tendency to show a character trait or propensity to commit certain kinds of acts. For example, when *modus operandi* evidence is used to prove the identity of an unknown perpetrator, its probative value is drawn from the sound proposition that "one can reasonably infer that two 'strikingly similar' crimes were probably committed by the same person. That means that the identity of an unknown perpetrator can be inferred by the striking similarity between his crime and a different crime committed by a known perpetrator." *Id.* at 150.

But when a prior crime is used "to prove the *corpus delicti,"* the probative value of the *modus operandi* evidence is derived solely from the presumption that the unproven accusation of crime must be true because we know that the accused person had done it before. He must be guilty because he has a propensity for conduct of this nature. The prior, or "other," bad act is relevant *only* because it reveals the actor's propensity to commit such acts. It serves no "other purpose," as provided for in KRE 404(b). Therefore, it falls outside of the exceptions provided by KRE 404 and lands squarely within its prohibition.

Our use of the so-called *"modus operandi* to prove *corpus delicti"* exception to KRE 404(b) is an unsound departure from the traditional rule of evidence and is contrary to language of KRE 404. I respectfully submit that we should reject its further use.

### D. The fallacy of using one allegation of crime to prove the truth of another

Even when I set aside my disapproval of the *"modus operandi"* to prove *corpus delicti'* theory, I must protest its use here because of the way it is applied. In any application, *modus operandi* evidence draws it persuasive force, its relevance, from the reasonable inference that two similar consequences arose from a common cause. We infer the cause of an unknown event from our knowledge of a similar event whose cause we know.[100] Our conclusion about the unknown event is credible *only* because it was based upon a known premise. In this case, however, we have no known premise upon which to base our conclusion. We begin the process with two unproven allegations, one by Jennifer and·one by Karen, and let each one serve as the premise that proves the other. This is a distortion of the sound logical underpinning upon which the *"modus operandi"* principle properly operates.

When *modus operandi* evidence is used, for example, to prove the identity of an arsonist, we have a defendant who denies that he set the building on fire but, ordinarily, does not or cannot refute the fact

---

100. In *Graves,* we stated it this way: "The relevance of *modus operandi* evidence is based upon the simple logical precept that begins with this premise: One can reasonably infer that two strikingly similar crimes were probably committed by the same person. That means that the identity of an unknown perpetrator can be inferred by the striking similarity between his crime and a different crime committed by a known perpetrator. Therefore, if we know the identity of the person who committed one of the crimes, we can infer that that person committed the other strikingly similar crime." 384 S.W.3d at 150.

that a building was burned. The defendant's known record for committing similar arsons may establish that he committed the arson in question.

A similar form of deductive reasoning cannot be constructed when *"modus operandi"* is used to prove the *"corpus delicti"* and there is no clearly established or undisputed pattern of conduct by which to judge the unproven allegation. Newcomb has no established record of "strikingly similar" acts by which we can judge his guilt on Jennifer's allegation. Instead, we compare it to the unproven allegation of Karen. Likewise, there is no established conduct of Newcomb to prove his guilt as to Karen's allegation, so we compare it to the allegation that Jennifer made. In this case we are *not,* as it may appear at a glance, allowing one party to prove an *allegation* of crime against one victim by offering evidence that Newcomb had committed a strikingly similar crime on a different occasion. We do not have for our comparison a "strikingly similar" prior *act.* Instead, we have two strikingly similar *allegations.*

We are allowing as *"modus operandi"* evidence, each allegation to be the "strikingly similar" act that tends to prove the truth of the other. Each allegation thus becomes one of the cards, each pitched against the other, in a house of cards built to support two convictions.

### III. CONCLUSION

In summary, I dissent because the Majority opinion is based upon an unsound application of the *"modus operandi* to prove *corpus delicti"* theory, which is itself an unsound exception to KRE 404 that we should discard. Additionally, I dissent because, instead of examining the actual prejudice, or lack thereof, that arose from joining the two charges, the Majority has elevated the ruling in *Rearick* to the status

of an irrebuttable presumption that there is no prejudice by joinder of the charges, thereby writing KRE 403 right out of the analysis.

CUNNINGHAM, J., joins.