# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 16, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0433-MR

COURTNEY KIDD                                                                APPELLANT

V.

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
NO.17-CR-01021

COMMONWEALTH OF KENTUCKY                                          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

This case comes before the Court on appeal as a matter of right[1] by Courtney Kidd, the Appellant, from the judgment and sentence of the Fayette Circuit Court. After a six-day jury trial, Kidd was convicted of first-degree murder; first-degree attempted murder; and pled guilty to being a convicted felon in possession of a handgun, a charge he agreed to let the jury pass sentence upon. He was additionally found guilty of being a persistent felony offender. He was sentenced by the court to thirty years for murder, twenty-five years for attempted murder, and fifteen years for the firearm possession charge, to be served concurrently.[2]

---

[1] Ky. Const. § 110(2)(b).

[2] Originally, the jury had recommended, and the court followed, a PFO-enhanced sentence of thirty-five years for the murder. Kidd, however, brought this error to the court's attention soon afterward and the Commonwealth agreed it was error, so a re-sentencing was conducted.

Kidd brings five claims of error. First, the court erred in giving an initial aggressor instruction; second, but related, the court erred in giving an incomplete initial aggressor instruction; third, the court erred by failing to declare a mistrial after two emotional outbursts by the victim's family during opening statements; fourth, the court erred in prohibiting him from telling the jury his friendship with the victim formed while both were in jail together; and finally, the lead detective in the case gave inadmissible testimony which tended to lead the jury to believe a bystander was in fact part of a plot with Kidd to murder the victim.

After a thorough review of the record, we affirm the conviction.

## I. Factual and Procedural Background

On May 7, 2017, Kidd shot Jordan Yeast nine times at point-blank range. He then fired three shots in the direction of Yeast's girlfriend, Courtney Bowen, before fleeing the scene. These events were captured by a video camera at the entrance of the apartment complex where Yeast was killed. The video is remarkably clear and all persons in the video are readily identifiable.

From the camera's viewpoint, the viewer sees a small parking lot with one parking lane immediately perpendicular to the camera and another opposite it at the far end. The relevant part of the video begins when a car pulls into one of the spots at the far side. In a parking spot directly in front of the camera, with the front of the car facing the camera so that the passenger side door is to the viewer's left, a woman, Bowen, is outside the car and organizing her things. She begins to walk toward the car which has just parked at the

2

opposite end, as two males exit, Yeast and Kentaris Wansley. Brown walks back to her car, looks into it, and reaches for something, then proceeds to walk towards Yeast. Yeast, however, has been walking towards her and his car so the two make a straight line back to the passenger side of the car. At this time, Wansley has proceeded into the building, or at least under the awning, out of view of the camera.

At the exact moment that Yeast enters the vehicle from the passenger side, Kidd enters the camera view, approaching Yeast's vehicle from the rear driver's side. As Kidd approaches the passenger door, Yeast has crossed over to the driver's seat.[3] Bowen is standing immediately outside the open passenger door. Kidd's approach to the vehicle is not casual. He is jogging, wearing a hoodie with the hood on his head, but not obscuring his face, and his hands in the pouch area. As soon as Kidd is at the rear passenger side light, he plainly draws a gun from the hoodie pouch. The gun is in his right hand. Bowen testified Kidd told her "move, bitch" when he got to the door. She complied, standing a bit off from the passenger door behind Kidd. Kidd has meanwhile positioned himself so that his right hand with the gun is clearly visible to Yeast, his back towards the camera and the car blocking the camera's view of the gun. Because the passenger door is wide open at this point, Kidd's body, slightly crouched to communicate with Yeast, is visible from Yeast's point of view. From the moment Kidd gets to the passenger door and the gun is visible to Yeast, a mere twelve seconds elapses before Kidd raises the gun and shoots

---

[3] This is apparently due to the driver's side door being broken and tied shut.

3

Yeast. During these twelve seconds, Wansley has reentered the camera view and approached the car at the driver's side. Bowen testified Kidd began asking "where's the shit?", referring to drugs allegedly stolen earlier in the day by Yeast from Kidd. Another bystander, Frank Mabson, who never appears in the video, testified he heard Kidd ask where his money was. Immediately before Kidd shoots Yeast, Wansley appears to tap on the driver's side door. Kidd takes a step back to erect himself, raises the pistol, and opens fire.

The camera angle, the car position, and the glare of the sun obscures the view of the pistol being fired as it is the one part of Kidd's body which is within the car. But Bowen, behind Kidd, and Wansley, beside Yeast, both react. Bowen runs out of the camera's view. The driver's side window has shattered, forcing Wansley to retreat immediately out of view. Kidd stops firing and takes a step back. He immediately raises his gun again, now clearly in view, and fires another round at Yeast from outside the car. A brief pause, another step back, and he fires his final shot at Yeast. Kidd has maneuvered himself just beyond the passenger side door now. At the same time, Wansley has reentered the camera frame from the driver's side rear of the vehicle, somewhat in the middle of the parking lot. Kidd now turns his head in the direction Bowen fled. He raises the pistol and fires two shots in rapid succession. He takes a step forward and fires another shot. His ammunition is now spent. Kidd briefly keeps the gun raised in Bowen's direction, but then puts the gun back into his hoodie pouch and runs behind the vehicle. Wansley has continued to walk behind the vehicle and is now on the passenger side but still in the middle of

4

the parking lot, walking away from the vehicle. Kidd, just passing Yeast's vehicle in the same direction he originally came from, pivots and jogs in the direction of Wansley, although there doesn't seem to be any communication between the two. Kidd instead flees from the opposite direction he came, going in between a building and what looks to be stairs, exiting view. Wansley has by now also exited the camera's view. At this point, we need not describe the video further. The total time span of the relevant portion is less than thirty seconds.

The medical examiner testified to Yeast being shot nine times, in the head, torso, and various other extremities. The firearm was never recovered. Lawrence Pilcher, Kentucky State Police's firearms examiner, testified the nine cartridges recovered at the scene were fired from the same gun, a .40 Smith & Wesson semi-automatic pistol. Kidd was identified to police by Courtney Bowen. Sgt. Tyson Carroll, the lead detective, filed an expedited request for Kidd's phone call records for the previous 48 hours, as well as a tracking ping upon his cell phone for the subsequent 48 hours. Kidd, however, had fled to Michigan, and would be arrested in Dearborn by U.S. Marshals on June 27, 2017.

At trial, Kidd argued his case as imperfect self-defense. To make this case, he testified to a childhood filled with drugs, abuse, and shootings, including witnessing the shooting death of his brother. He retained an expert to testify that from these youthful experiences, Kidd suffered from Post-Traumatic Stress. The effects of this syndrome on Kidd were to make him edgy, almost hypervigilant, and prone to emotional snaps or overreactions.

5

Kidd further testified Yeast had come to his apartment earlier that day looking for drugs and robbed him. Here it is necessary to remark that Kidd insisted he and Yeast were good friends. He had wanted to tell the jury their friendship formed in jail, where he frequently purchased toiletries for Yeast as well as paying for his phone card. The Commonwealth objected to this on grounds of prejudice to the victim who could not then rehabilitate himself. Though skeptical, the trial court sustained the objection. Thus, Kidd only testified that he and Yeast were good friends and that he bought him toiletries and paid his phone bill sometimes.

But outside of jail, the relationship between Kidd and Yeast was not a typical friendship. Indeed, it looks much more like an employer-employee relationship, with their business being drugs. Yeast frequently sold drugs supplied to him by Kidd, and in return Kidd was to receive a specific amount of money from the anticipated sales.[4] Kidd related, however, that Yeast was a poor employee who frequently failed to sell the drugs or give Kidd all the money agreed to. According to Kidd, only a couple hours prior to the shooting, Yeast had visited him in order to get nineteen Percocet pills to sell. Kidd demanded Yeast pay him first. Yeast did not have any money, so he asked Kidd to step outside with him. Upon doing so, Yeast allegedly held Kidd at gunpoint, but Kidd never saw the weapon. Yeast then stole the pills and left. Kidd attempted to contact Yeast, calling him four times and sending a text message. The message was sent approximately one hour before the shooting.

---

[4] This practice is known as "consignment" in the drug trade.

6

By sheer happenstance, Kidd decided to go to the same apartment building in search of marijuana that Yeast and Bowen had gone to, Lakeshore Apartments. When Kidd arrived, he observed Yeast and Bowen walking in the parking lot, and the events previously described transpired.

At trial, two emotional outbursts occurred during the opening statements of both parties. During the Commonwealth's opening, just after the video of the shooting had been shown, general but quite audible gasping and weeping occurred as well as Yeast's father calling Kidd a "coward" and "f\*\*king coward" multiple times. The parties approached the bench and defense counsel informed the court he would be seeking a mistrial upon another outburst. The defense made no other request of the court, but the court did admonish the audience to restrain themselves or leave the courtroom if they could not do so.

During the defense's opening statement, just after counsel had stated evidence would show Kidd shot Yeast in self-defense, another general and audible outburst of groans, gasps, and weeping could be heard but there were no other outbursts specifically accosting Kidd. The parties approached the bench and defense asked for a mistrial. The Commonwealth objected, arguing since their opening had also been interrupted there was no prejudice. The court removed the jury and gave a second admonition to the audience. He also had the bailiff remove Yeast's father from the courtroom. The court then instructed counsel to continue his opening statement while he considered the motion for a mistrial. Upon conclusion, the trial court ruled a mistrial would be

7

too extreme and noted it is a discretionary decision. The court denied the motion and the trial continued.

During the testimony of Sgt. Carroll, he was asked about his investigation into Wansley as possibly involved in the shooting as an accomplice. Sgt. Carroll testified phone records from Kidd's phone prior to the shooting showed he had spoken with Wansley. Upon searching the phone records of Wansley, it was shown the two had also spoken after the shooting. Sgt. Carroll also believed Wansley's conduct during the shooting was suspicious and was in the process of testifying his behavior was not typical of an innocent bystander before being cut off by a defense objection. The court sustained the objection but allowed the Commonwealth to tie up the loose end the testimony had by then created. The Commonwealth did so, and the trial continued.

Finally, after the cases-in-chief were concluded, the matter of jury instructions came up. Because Kidd had testified to his own subjective belief that Yeast was armed and reaching for a gun precipitating his imperfect self-defense, as well as the expert testifying to Kidd's Post-Traumatic Stress, he requested and was granted a self-defense instruction pursuant to KRS[5] 503.050. The Commonwealth requested an initial aggressor instruction to qualify the self-defense instruction, pursuant to KRS 503.060. Kidd objected. The Commonwealth argued the jury could disbelieve Kidd's testimony as to the validity of his belief he needed to defend himself from Yeast and, if they did so,

---

[5] Kentucky Revised Statutes.

the video evidence was sufficient for a jury to conclude Kidd was an initial aggressor. The court agreed and gave that instruction as well. Kidd now argues on appeal, but concedes it was not objected to at trial, that the initial aggressor instruction, even if justified by the evidence, was yet incomplete. Because of the lack of objection, we will review for palpable error. We now address the merits of the appeal.

## II. Standard of Review

Our review for all but one of the errors alleged is for an abuse of discretion. "'We review a trial court's rulings regarding instructions for an abuse of discretion.'" *Holbrook v. Commonwealth,* 525 S.W.3d 73, 87 (Ky. 2017) (quoting *Ratliff v. Commonwealth,* 194 S.W.3d 258, 274 (Ky. 2006)). "'We review a trial court's denial of a mistrial for abuse of discretion.'" *Wright v. Commonwealth,* 590 S.W.3d 255, 260 (Ky. 2019) (quoting *Slone v. Commonwealth,* 382 S.W.3d 851, 858 (Ky. 2012)). "When exclusion of evidence does not significantly undermine fundamental elements of the defendant's defense," evidentiary rulings are reviewed for abuse of discretion. *Newcomb v. Commonwealth,* 410 S.W.3d 63, 85 (Ky. 2013) (quoting *Mullins v. Commonwealth,* 956 S.W.2d 210, 213 (Ky. 1997)). In all reviews for abuse of discretion, only those errors that are arbitrary, unreasonable, unfair, or unsupported by sound legal principles will justify reversal. *Wright,* 590 S.W.3d at 260.

A palpable error is one which affects the substantial rights of the appellant and "appropriate relief may be granted upon a determination that

9

manifest injustice has resulted from the error." RCr[6] 10.26. Manifest injustice occurs when an error "so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Conrad v. Commonwealth*, 534 S.W.3d 779, 783 (Ky. 2017) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)).

### III. Analysis

### A. An Initial Aggressor Instruction was Warranted by the Evidence

Trial courts have a duty to instruct the jury on the law in writing. RCr 9.54. Regarding qualified self-defense instructions, we have held courts must look to the "whole circumstances which surround the incident . . . ." in deciding if the instruction is proper. *Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980). "[B]efore such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury." *Id.* (citing *Mayfield v. Commonwealth*, 479 S.W.2d 578 (Ky. 1972)). The pertinent part of KRS 503.060 states,

> [T]he use of physical force by a defendant upon another person is not justifiable when:
>
> (2) The defendant, with the intention of causing death or serious physical injury to the other person, provokes the use of physical force by such other person; or
>
> (3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:

---

[6] Kentucky Rules of Criminal Procedure.

10

> (a) His initial physical force was nondeadly and the force
> returned by the other is such that he believes himself to
> be in imminent danger of death or serious physical injury.
> . . . .

Deadly physical force is "force which is used with the purpose of causing death or serious physical injury or which the defendant knows to create a substantial risk of causing death or serious physical injury." KRS 503.010(1). Physical force is "force used upon or directed toward the body of another person and includes confinement." KRS 503.010(4).

Kidd argues the instruction was not warranted because he believed Yeast to have been armed and to have made a move for what Kidd believed to be a gun just prior to shooting Yeast nine times. Second, he argues he never committed an act of physical force prior to his shooting of Yeast, and that he was doing nothing more than holding the gun as any other normal, law-abiding citizen.[7] Finally, he argues brandishing the weapon does not meet the definition of physical force. To support his case, he likens his conduct to the defendant's in *Conley v. Commonwealth*, 599 S.W.3d 756 (Ky. 2019).

*Conley* is inapposite here. In that case, we held an initial aggressor instruction was prejudicial error because "[t]here simply was no evidence presented at trial, direct or circumstantial, that Conley was the initial aggressor in the confrontation to warrant an instruction diminishing her self-protection defense." *Id.* at 776. Moreover, "Conley had scratches and cuts on

---

[7] This argument is without merit as Kidd had no right to carry a gun. KRS 527.040. Moreover, no reasonable person would confuse his conduct in the video with a law-abiding citizen peacefully exercising their right to bear arms. Kidd was brandishing the gun and pointing it at Yeast.

11

her arms and hands, the left side top of her head was bruised, and she had blood in her hair. Her examination at the police station disclosed that she had a cut on her head and behind her ear, bruises, and a black eye." *Id.* at 775. All these injuries were consistent with her account that her mother had attacked her prior to Conley stabbing her. *Id.* This is manifestly not the case with Kidd, where video evidence gives a near street-level view of the entire shooting. We need not describe it again to conclude a jury could view this video and believe it to be direct evidence of Kidd acting as the initial aggressor.

But Kidd complains the initial aggressor instruction precluded the jury from considering his argument of imperfect self-defense. We recently stated, "Whether a defendant is the initial aggressor is a limiting instruction included within the self-protection instruction, not an absolute bar to a self-protection instruction." *Sutton v. Commonwealth*, 627 S.W.3d 836, 853 (Ky. 2021). Nonetheless, the purpose of the initial aggressor doctrine "is to prevent a defendant from instigating a course of conduct then claiming he was acting in self-defense when that conduct unfolds." *Conley*, 599 S.W.3d at 775 (quoting *Randolph v. Commonwealth*, 566 S.W.3d 576 (Ky. App. 2018)). The court below gave a self-defense instruction as Kidd requested so it did not violate our holding in *Sutton*. The Commonwealth correctly argued the jury could see the video of the shooting, disbelieve Kidd's account, and conclude Kidd was an initial aggressor, so the court included that qualifying instruction as well. That an initial aggressor instruction precludes a self-defense theory is simply the law functioning as intended. *Id.*

12

Finally, Kidd argues the initial aggressor instruction was incomplete.[8] It must again be reiterated that the initial aggressor instruction is part and parcel of a self-defense theory. "Whether a defendant is the initial aggressor is a limiting instruction *included within* the self-protection instruction . . . ." *Sutton*, 627 S.W.3d at 853 (emphasis added). Thus, the jury's determination that Kidd is guilty of intentional murder controls any secondary factual issues regarding the qualification of an initial aggressor instruction on appeal. The jury is the only fact finder of guilty or not guilty; its power to determine the facts is not subject to control. *Commonwealth v. Durham*, 57 S.W.3d 829, 836 (Ky. 2001). Although the trial court did not include a special instruction or interrogatory on the specific issue of whether Kidd was believed to be an initial aggressor, our opinion in *Durham* was clear that such instructions and interrogatories were only to be used "sparingly and upon careful consideration of the defendant's due process rights." *Id.* at 837. Nor did Kidd ask for one. Thus, we believe the jury's determination that Kidd is guilty of intentional murder obviates any residual issues as to the self-defense instructions and precludes a finding of palpable error upon review. In other words, the jury rejected the self-defense theory so any error arising from the supposedly incomplete initial aggressor instruction could not have affected the fairness of the trial to such a degree as to be intolerable.

## C. Emotional Outbursts did not Merit Mistrial

---

[8] Specimen jury instructions for qualified initial aggressor instructions are given in *Commonwealth v. Hager*, 41 S.W.3d 828, 846 (Ky. 2001) and trial courts should follow them when the facts in evidence merit such instructions.

Declaring a mistrial is "an extreme remedy" that is only called for when a "fundamental defect" has occurred in the trial, resulting in a manifest injustice effectively denying the right to a fair trial, "and the prejudicial effect can be removed in no other way." *Wright*, 590 S.W.3d at 260 (quoting *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996)). Regarding emotional outbursts of victims and their families, "an admonition to the jury to disregard the display is more than sufficient to cure any possible prejudice that might occur from the situation." *Coulthard v. Commonwealth*, 230 S.W.3d 572, 577 (Ky. 2007). During the trial below, the two emotional outbursts of the family included gasping and weeping. The first outburst also had Yeast's father calling Kidd a coward, with a vulgarity included, after video of the shooting had played. Kidd moved for a mistrial only after the second outburst which did not feature a vulgar outburst. Kidd now argues the trial court should have admonished the jury *sua sponte*, and since it did not do so, it ought to have declared a mistrial.

This issue has been addressed time and again and is sufficiently discussed in *Coulthard*. That case too featured several outbursts of friends and family of the homicide victim sobbing and generally rustling to get up and leave the courtroom. *Id.* at 577. Notably, there was also an instance in which the jury was escorted past the crying family and several jury members began crying themselves. *Id.* Nonetheless, the defendant never asked for a jury admonition. He first asked for a recess and upon returning to the courtroom,

14

having noticed some jurors reacting to the bereft family, then asked for a mistrial. *Id.*

While there are noticeable differences in the outbursts in this case and *Coulthard,* they are not so substantial as to render *Coulthard* non-controlling. We agree a jury admonition ought to have been given to disregard the emotional outbursts. But Kidd never asked for a jury admonition. Instead, he moved for a mistrial. *Coulthard* makes clear this Court has for decades refused to reverse a conviction simply because a jury admonition upon an emotional outburst was not given except when specifically denied upon request. *Id.* at 578 (citing *Lanham v. Commonwealth,* 171 S.W.3d 14, 32 (Ky. 2005)); *Jackson v. Commonwealth,* 275 S.W.2d 788, 789 (Ky. 1955); *Merrifield v. Commonwealth,* 268 S.W.2d 405, 408 (Ky. 1954)). Since Kidd did not request an admonition to the jury, "the failure to give the admonition and the conduct complained of are not considered prejudicial. The court properly refused to discharge the jury." *Id.* (quoting *Jackson v. Commonwealth,* 275 S.W.2d 788, 789 (Ky. 1955)).

## D. No Abuse of Discretion for Evidentiary Rulings

Finally, we come to the evidentiary rulings of the court. First, the court prohibited Kidd from mentioning his friendship with Yeast had formed while both were in jail together. Second, Sgt. Carroll gave testimony that Kidd contends led the jury to believe Kidd and Wansley had worked together to arrange the murder of Yeast.

15

First, we address implications of a defendant's due process right to present a defense. Both Federal and Kentucky constitutions guarantee this right. *Newcomb*, 410 S.W.3d at 84-85. "An exclusion of evidence will almost invariably be declared unconstitutional when it significantly undermines fundamental elements of the defendant's defense." *Id.* at 85 (quoting *Beaty v. Commonwealth*, 125 S.W.3d 196, 206-07 (Ky. 2003) *abrogated on other grounds by Gray v. Commonwealth*, 480 S.W.3d 253, 267-68 (Ky. 2016). But when exclusion "does not significantly undermine fundamental elements of the defendant's defense[,]" then there is no need for a constitutional analysis. *Id.* We are satisfied the jail environment as part of the origin of Kidd's friendship with Yeast is not a fundamental element of his defense, as it has no bearing on whether Kidd had a bona fide belief that he was in imminent risk of death or substantial physical injury by Yeast's alleged conduct.

At trial, the court expressed skepticism that mentioning Yeast had been in jail would be all that prejudicial given the jury already knew he was active in the drug trade; but it prohibited the testimony, nonetheless. We tend to agree this testimony would not have caused prejudice, but mere disagreement is an inadequate basis upon which to find an abuse of discretion. Moreover, we do not believe this fact particularly probative of any element to Kidd's defense. He argues knowing their friendship formed in jail was necessary to convey to the jury how "devastating Mr. Yeast's betrayal [by the earlier robbery] . . . was." If that is the case, then the court's action was certainly an inadvertent boon. Telling a jury you felt deeply betrayed by a man you hours later shot to death

16

could only have lent credence to the Commonwealth's theory that this was nothing more than a revenge killing between two drug dealers. In the end, the trial court was faced with a pure judgment call and the record reveals the decision was not arbitrary nor unsupported by sound legal principles.

Now we come to a portion of Sgt. Carroll's testimony wherein he testified that behaviors of the witness, Wansley, caused Sgt. Carroll to investigate him as a suspect. Specifically, Sgt. Carroll gave a pat description of Wansley's actions, readily observable on the video, and was in the process of expressing the opinion that said behavior was not typical for someone who is an innocent bystander. Importantly, Sgt. Carroll never got to complete his thought on the matter due to a defense objection, but where the testimony was going seems obvious. Kidd argues Sgt. Carroll's narrating of events on the video, and then his speculation on Wansley's possible involvement and the reasonableness of his behavior was prejudicial to him, as it served to lead the jury to falsely believe the murder of Yeast was a coordinated hit by Kidd and Wansley.

In *Ordway v. Commonwealth,* we held a police detective could not testify "to authoritatively suggest how innocent persons behave after they lawfully engage in an act of self-defense, and to then, with some measure of certainty, exclude Appellant from that class of persons based upon his conduct following the shooting." 391 S.W.3d 762, 775-76 (Ky. 2013). To explain our decision, we said, "a party may not introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class

17

because he acted the same way under similar circumstances." *Id.* at 776.

Therefore, the detective's

> testimony contrasting his opinion on the habits of suspects who, as a class, have truthfully invoked the defense of self-protection against the class of those who have lied about it, and how Appellant's post-shooting conduct was consistent with the latter, should have been excluded as improper opinion testimony and irrelevant.

*Id.*

Notably, however, we included the caveat that "a prosecutor may continue to *argue* reasonable inferences derived from a particular defendant's behavior, such as flight from the scene of a crime, is indicative of guilt. Those are simply appeals to the common sense and collective wisdom of the jury, based upon their own everyday experiences." *Id.* (footnote omitted). In contrast, the detective "in effect, urged the jury to depend upon his apparent expertise as a police officer and his perception and opinion about matters outside the realm of common knowledge." *Id.* at 776-77.

Two important distinctions exist between this case and *Ordway*. First, Sgt. Carroll did not testify to the behavior of the defendant, but of a witness. Second, the testimony offered by the police officers in each case is materially different. The officer in *Ordway* told the jury there were definitive behaviors that innocent people exhibited, and those behaviors were not manifested by Ordway during his investigation. Sgt. Carroll never made such a sweeping generalization about Wansley. He was asked if Wansley had ever been investigated as a suspect in the shooting and to explain why. He then described Wansley's actions in the video—the video the jury had already seen before and

18

would see again. He was in the process of saying the behavior was not typical of an innocent bystander before he was cut off. This testimony in isolation may not appear substantively different from that in *Ordway*, but prior to the testimony objected to, Sgt. Carroll had testified to facts which tended to eliminate the inference of guilt or a coordinated plan to murder Yeast.

Sgt. Carroll testified that days after the shooting he had seized Wansley's phone after he and Wansley had arranged to meet. The seizure was based on Wansley's presence at the scene but also on the phone records of Kidd's phone from the 48 hours prior the shooting. Sgt. Carroll testified those records, as well as Wansley's call records after obtaining a search warrant for his phone, revealed Kidd and Wansley had communicated prior to and after the shooting. Kidd made no objection to this testimony. Sgt. Carroll was asked,

> Commonwealth: Was there anything of significance to your investigation?
>
> Carroll: On the device [Wansley's phone], on the device itself?
>
> Commonwealth: Yes.
>
> Carroll: Nothing that I, nothing that I derived of any significant fact.

In short, Sgt. Carroll unequivocally testified Wansley's phone contained nothing—no text messages, photographs, emails—that could be described as significant evidence of a conspiracy between Wansley and Kidd to murder Yeast.

After Kidd's objection had cut off Sgt. Carroll's testimony, the court agreed the Commonwealth was heading towards improper testimony. The court

19

sustained the objection but allowed the Commonwealth to tie up the loose end of the investigation into Wansley with two short questions:

> Commonwealth: Based on your observations of that video in addition to the fact that you knew that Mr. Wansley was in communication with the defendant and obviously in the presence of the victim, did that cause you enough suspicion to investigate him in this case or what his possible involvement in the case might be?
>
> Sgt. Carroll: Yes, it did.
>
> Commonwealth: And were you at the end of that investigation able to develop enough proof to charge him?
>
> Sgt. Carroll: No, I was not.

These questions are not inappropriate, nor were Sgt. Carroll's answers. The Commonwealth did not cast Wansley as a member of a class of liars or criminals, but instead predicated its question on two objective and indisputable facts: Wansley's phone calls with Kidd and his presence and behavior at the crime scene. And the final question must be regarded in the light of Sgt. Carroll's whole testimony. One might infer from the phrasing that proof of Wansley's involvement exists, just never found. But Sgt. Carroll had already testified that he didn't find anything of significance on Wansley's phone. Therefore, the testimony was not improper or prejudicial.

### IV. CONCLUSION

For the foregoing reasons, we conclude the trial court did not abuse its discretion by the inclusion of the initial aggressor instruction under KRS 503.060(3); did not abuse its discretion in refusing to declare a mistrial; and did not abuse its discretion in prohibiting mention of Kidd and Yeast forming

20

their friendship in jail, or in allowing the testimony of Sgt. Carroll regarding his investigation into Wansley. The Fayette Circuit Court is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General