RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0301-MR

WILLIAM P. BROWN                                                           APPELLANT

V.
ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE THOMAS L. TRAVIS, JUDGE
NO. 20-CR-01056

COMMONWEALTH OF KENTUCKY                                             APPELLEE

**OPINION OF THE COURT BY JUSTICE BISIG**

**REVERSING AND REMANDING**

The Fayette Circuit Court held a jury trial of Appellant William P. Brown on charges of murder, receiving stolen property, being a felon in possession of a handgun, and being a second-degree persistent felony offender. The jury found Brown guilty of these charges and recommended a total sentence of life in prison. The trial court sentenced in conformity with that recommendation and Brown now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case relates to the murder of 62-year-old Ava Creech, whose body was found on October 2, 2020, bound, gagged, and decomposing in a closet in her apartment on Victoria Way in Lexington. Creech suffered from severe scoliosis and thus her best friend Autumn Yeary frequently stopped by to help

Creech with tasks around the home. On September 10, 2020, Yeary stopped by Creech's apartment and found her there with Appellant Brown, and thus did not stay long.

On the following day, Yeary arrived at Creech's apartment and discovered her dressed up and on her way out. Yeary learned that Creech was angry with Brown regarding some money he owed her. Though Yeary attempted to convince Creech to let the debt go, Creech was determined to collect it. This was the last time Yeary saw Creech.

On September 12, Yeary went to Creech's apartment but neither Creech nor her blue Kia were there. Yeary called Creech's cell phone but the call went straight to voicemail. Yeary returned to Creech's apartment several times on that day and the next and continued trying to call her, but was unable to locate or reach Creech.

On September 15, Yeary noticed that items from Creech's trunk had been left in the parking lot next to the spot where Creech parked. Yeary contacted Renee Simpson, a mutual friend who had a spare key to Creech's apartment.[1] Yeary and Simpson entered the apartment and eventually discovered a young woman they did not know, Layla Hackett, lying on Creech's bed.

Yeary called the police and Officer Conner Sands with the Lexington Police Department ("LPD") responded. Hackett told Officer Sands that Brown had let her stay in the apartment. Officer Sands went inside the apartment

---

[1] Simpson was deceased at the time of trial.

2

with Hackett so she could retrieve her things, and then later did a second protective sweep of the apartment. He was not searching for and did not locate a deceased person at that time.

Officer Sands also attempted to have Creech's cell phone pinged but it had been turned off. The last ping had been on September 12 in Clay City, Kentucky. Brown's phone pinged at the same time and location, and again on September 13 off a tower close to Creech's apartment—the same day Hackett said Brown took her to Creech's apartment.

On September 17, LPD Detective Jeremy Adkins went to Creech's apartment. Creech's landlord informed Detective Adkins that someone named Bill had been staying with Creech for the past three weeks.

On September 22, Detective Adkins received an anonymous tip through Crimestoppers identifying Brown as a person of interest in connection with Creech's disappearance. He later learned the tip had been submitted by Christine Brumagen, a woman with whom Brown had been spending time. Law enforcement obtained Brown's cell phone records, which revealed he was in regular contact with Creech from August 17 until September 11, after which time communication between them ceased. Brown shut off service to his cell phone on September 28.

Detective Adkins spoke with Hackett on September 28. Hackett confirmed Brown took her to Creech's apartment on September 13 and let her stay there, and that Hackett did not know Creech.

On October 1, Detective Adkins searched a database and discovered Brown had pawned a number of items on September 21 and 22. Creech's son confirmed that those items included a necklace belonging to Creech.

On October 2, LPD Detective Jeff Jackson executed a search warrant for Creech's apartment. A strong smell was present, which Detective Jackson traced to a closet. Detective Jackson removed totes from the closet and discovered Creech's body lying beneath them. Creech's wrists were bound with duct tape. Duct tape was also wrapped around her head several times, completely covering her nose and mouth. There were no signs of forced entry on the door or windows of the apartment.

An autopsy revealed that Creech suffered blunt force trauma to the back of her head, and that a wad of paper towels had been shoved in her mouth as a gag. Her cause of death was both blunt force trauma to the head and asphyxia from smothering. Her body was also badly decomposed. The medical examiner testified the level of decomposition was consistent with having died on September 11, but the death also could have occurred days later.

Fingerprints taken from a Swiffer in Creech's apartment were matched to Brown. A roll of duct tape collected from Creech's kitchen tested positive for human blood and had the DNA of both Brown and Creech on it.

On October 5, Detective Adkins located records indicating that a white minivan was registered to Brown. Law enforcement located the van the following day sitting outside Brumagen's residence, and ultimately located

4

Brown inside. At the time he was found to be in possession of pill bottles bearing Creech's name.

Brumagen stated she met Brown in January 2020, and that around August 24 he had stopped contacting her. However he resumed frequently contacting her on September 11 or 12. On September 13, Brown called Brumagen and offered her the white minivan. She met him in a Walmart parking lot, where Brown picked her up in Creech's missing blue Kia. He drove Brumagen to a location she later found out was Creech's apartment and gave her the van.

Brumagen kept the van for a few days before Brown called and asked for it back. On September 16, Brumagen met Brown, who was driving Creech's blue car, and followed him to a Walmart parking lot where he left Creech's car. Brown told Brumagen he believed the police were looking for the blue car. Brumagen informed law enforcement that Brown had then thrown Creech's car keys into a tree line outside a hotel. Police located the keys to Creech's car at the site identified by Brumagen.

Police never recovered the cell phone of either Creech or Brown. However a search warrant for their phone records revealed that Creech and Brown had exchanged 46 calls and texts between August 12 and September 11. Creech's last call was made on September 11 to Brown. Brown never contacted Creech's cell phone after September 11.

Brown was ultimately arrested and indicted for the murder of Creech, receiving stolen property in the form of Creech's car, receiving stolen property

5

in the form of Creech's necklace that he pawned, being a felon in possession of a handgun, and being a second-degree persistent felony offender. At trial, Brown testified on his own behalf. He stated that he had nothing to do with Creech's disappearance or murder. Brown testified that he helped Creech out around her apartment, and that at some point she got bed bugs which required them to wrap everything in plastic bags secured with duct tape. Brown offered this as an explanation for the duct tape at her apartment. Yeary and Creech's landlord also testified that Creech had had a bed bug problem.

Brown further testified that on the afternoon of September 12, he drove Creech to Martin, Kentucky so that she could sell drugs. He stated that along the way, Creech became aggravated by her daughter-in-law's persistent texting and therefore turned her phone off. He claimed that he dropped off Creech while she sold the drugs and then picked her up for the drive back to her apartment in Lexington. Brown testified that Creech had a lot of money on her at the time. Brown stated they arrived back at Creech's apartment very late, and that Hackett was still in her apartment at the time. Brown also testified that he had a deal with Creech that in exchange for driving her to Martin, he would be able to use her car when they returned to Lexington because his minivan had a short that made it difficult to drive. This was his explanation for his possession of Creech's car after Creech's disappearance.

Brown further told the jury that on September 15 or 16, Simpson called and told him Creech was going to report the car missing if he did not return with it. Brown claimed he did not want to return the car to Creech's apartment

6

because he did not want to deal with the police if she had called them. He thus testified he told Simpson he would meet her in the Hamburg area of Lexington with the car.

Brown further stated that the car got a flat tire on the way to Hamburg and he therefore left it in a Walmart parking lot. According to Brown, he arranged for two other men to fix the car and return it to Simpson in Hamburg, but he never heard anything further from her about the car. Brown also testified he had purchased Creech's pills that were in his possession when he was arrested. Brown further insisted the necklace he pawned was not Creech's, but rather from another woman who had exchanged it for methamphetamine, despite being shown a photograph of Creech wearing the necklace and the fact that Creech's son identified the necklace as belonging to her.

The jury found Brown guilty on all counts and recommended a total sentence of life in prison. The trial court sentenced Brown in accordance with that recommendation, and he now appeals to this Court as a matter of right.

## ANALYSIS

Brown raises six issues for our review: (1) whether the prosecutor's comments on Brown's decision to testify or remain silent warrant reversal; (2) whether the Commonwealth's failure to disclose jail phone calls between Brown and his sister warrants reversal; (3) whether the admission of hearsay regarding Bill Rector's writing of a pink Post-It note violated Brown's rights under the Confrontation Clause; (4) whether Brown was entitled to a mistrial

7

after the prosecutor told the jury that defense counsel had lied to them; (5) whether Brown was entitled to directed verdict on the murder charge; and (6) whether there is sufficient cumulative error to warrant reversal. We conclude that the Commonwealth's failure to disclose the jail phone calls was a discovery violation necessitating reversal as the undisclosed information may have substantially impacted defense strategy and the presentation of Brown's defense. We therefore reverse and remand for a new trial. We further address only the remaining issues likely to recur in the event of retrial.[2]

I. **The Commonwealth's Failure To Disclose Jail Phone Calls Was A Discovery Violation Requiring Reversal.**

Brown argues that the Commonwealth's failure to disclose recordings of jail phone calls between Brown and his sister Patricia that were presented to the jury unduly prejudiced his defense and thus requires reversal. We agree.

While the prosecutor was cross-examining Brown, she asked whether he and Patricia had phone calls discussing the case. Brown was in jail at the time and the calls were therefore recorded. Defense counsel objected, noting that the recorded calls—at least some of which had occurred the week of trial—had not been disclosed in discovery. Defense counsel therefore requested an opportunity to review the calls during a break. The prosecution asserted it did not have to disclose the calls, and the trial court overruled Brown's objection.[3]

---

[2] Though evidence of course may differ on retrial, we note that based upon the significant evidence of guilt presented here, we would have found no error in the trial court's denial of Brown's motion for a directed verdict on the murder charge.

[3] The trial court appears to have been focused more on the issue of whether Brown's statements in the calls were admissible under the hearsay rules than on whether there had been a discovery violation.

8

The prosecution then played for the jury a portion of a recorded call in which Brown told Patricia his lawyer advised him "it's just hard to go in there and dispute the gun too much without making it look like you're lying about the murder." The prosecution also played portions of a call where Brown implied it was good for his case that Simpson was dead.[4] These calls were mentioned and portions of them were also replayed during the Commonwealth's closing statement. The prosecution also referred to the calls during their penalty phase closing as evidence that after being in jail on the charges for more than three years, Brown "hasn't learned anything" and "doesn't care," and invited the jury "when coming to a decision on that 20- to 50-year, life [sentence], consider all that."

Defense counsel's objection to admission of the calls, raising of the discovery violation, and request for an opportunity to review them was sufficient to preserve this error for consideration. Kentucky Rule of Evidence ("KRE") 103; Rule of Criminal Procedure ("RCr") 9.22. We review a preserved allegation of error in the admission of evidence for abuse of discretion. *Chestnut v. Commonwealth*, 250 S.W.3d 288, 298 (Ky. 2008).

RCr 7.24(1) requires the prosecution, upon written request by the defendant, to disclose and permit inspection and copying of "any oral incriminating statement known by the attorney for the Commonwealth to have been made by a defendant to any witness." RCr 7.24(2) also permits the trial

---

[4] By way of reminder, Simpson was the friend of Creech who assisted Yeary in searching Creech's apartment, and who Brown also testified was involved with Creech's purported attempts to recover her car from Brown after he borrowed it.

court to order the prosecution to permit the defendant to inspect and copy physical evidence that "may be material to the preparation of the defense." Here, the trial court entered such an order, which provided in relevant part that the Commonwealth was to disclose "[a]ny relevant written or recorded statements . . . by the Defendant" that were within the possession of the Commonwealth.

Here, Brown's statements in the calls regarding his trial strategy regarding the gun charge and Simpson's death were relevant and incriminating, and thus disclosure was required under the Rule and the trial court's discovery order. Brown's comment on the call about not disputing the gun charge to avoid appearing guilty for the murder clearly suggests a possible consciousness of guilt for the murder. Similarly, the recorded call in which Brown suggested he and his lawyer felt positive about the death of a material witness likewise suggests consciousness of guilt. We also note that the calls had been recorded five days before Brown took the stand, and thus the Commonwealth had ample time to produce them before he testified. As such, their disclosure was mandated by RCr 7.24 and the trial court's discovery order.

We also pause to note that the Commonwealth's contention before the trial court that disclosure was not required because the calls were offered as rebuttal evidence was a misstatement of the law. To the contrary, we have plainly held that

> the duty of discovery imposed [under RCr 7.24] does not end at the close of the Commonwealth's case in chief. Rebuttal does not offer

10

> a protective umbrella, under which prosecutors may lay in wait. "A cat and mouse game whereby the Commonwealth is permitted to withhold important information requested by the accused cannot be countenanced."

*Chestnut,* 250 S.W.3d at 297 (quoting *James v. Commonwealth,* 482 S.W.2d 92, 94 (Ky. 1972)). Thus, to the extent the trial court's refusal to order the Commonwealth to disclose the calls was premised on the use of that evidence solely for rebuttal purposes, it was error.

Reluctantly, we also find that the error requires reversal. We have held that a criminal discovery violation warrants reversal if "there is a reasonable probability that if the evidence were disclosed the result would have been different," or if the lack of disclosure "makes it doubtful that defense counsel would have proceeded in the same manner at trial." *Trigg v. Commonwealth,* 460 S.W.3d 322, 328 (Ky. 2015) (citation omitted). Here, Brown points out that had he been aware of the Commonwealth's possession of the recorded calls, he may have chosen not to testify at trial. He further points out he also may have chosen to testify, but to address the calls preemptively during the course of direct examination. Brown also explains that he declined to pursue bifurcation of the felon in possession of a handgun charge on April 29, 2020. He asserts that had he known then of the Commonwealth's intention to introduce the recorded calls from three days earlier in which he referenced a strategy of not vigorously contesting the gun charge to lend credibility to his denial of the murder charge, he might have chosen to seek bifurcation of the gun charge.

We find it both plausible and reasonable that Brown might have altered his defense in these meaningful ways had he known of the Commonwealth's

11

intention to produce the recorded calls at trial. As such, it is doubtful that Brown's defense would not have been materially changed by proper disclosure of the recordings. We therefore conclude the Commonwealth's failure to produce the calls requires reversal and remand for a new trial.

## II. The Prosecution's Comments On Brown's Decision To Testify And Failure To "Tell His Story" Before Trial Were Error.

Brown also argues that two comments by the prosecution on his decision as to whether to testify or remain silent were error. Again, we agree.

The first comment occurred during voir dire when the prosecutor was addressing the issue of assessing witness credibility with the panel. More particularly, the prosecutor was discussing reasons a witness may or not be considered credible. The prosecutor then made the following statement to the panel:

> Likewise, sometimes defendants testify. They don't have to testify, sometimes they do. Okay? Sometimes I'm wrong, but from where I'm sitting, where I'm standing right now, I always try to tell y'all what I think is going to happen, he's gonna testify. That's what I believe right now. He could change his mind.

Defense counsel objected and a bench conference was held, after which the trial court directed the prosecutor to move on. No admonition was given to the panel. However, the prosecutor did inform the panel that Brown had the right not to testify. Brown ultimately testified. He now argues that the prosecutor's comment violated statutory and constitutional prohibitions against the prosecution commenting on a defendant's exercise of the right to testify or remain silent.

12

Trial courts have broad discretion in the conduct of voir dire. *Newcomb v. Commonwealth*, 410 S.W.3d 63, 86 (Ky. 2013). However, both the Fifth Amendment to the U.S. Constitution and Section 11 of the Kentucky Constitution guarantee a defendant a right against self-incrimination, and thus the right to remain silent. KRS 421.225 further provides that a defendant's failure to testify also "shall not be commented upon or create any presumption against him."

Here, the prosecutor inexplicably offered her opinion during voir dire that Brown would testify. It is not beyond reason to conclude the jury would thus have expected—based on this representation by an attorney charged with representing the Commonwealth—for Brown to testify. As such, the comment improperly placed Brown in the predicament of either having to testify when he wished to remain silent in order to avoid defying the jury's expectation, or to remain silent at the expense of the risks inherent in failing to meet the jury's expectations. Either outcome would result in improper pressure upon Brown's decision as to whether to testify or remain silent. The comment therefore violated Brown's right to remain silent and was error.

While we have already found reversal warranted due to the discovery violation discussed above, and thus need not consider whether this error was also reversible, we nonetheless admonish the prosecutors of this Commonwealth to refrain from offering any opinion at trial regarding the likelihood that a criminal defendant will or will not testify. That said, we also acknowledge that the comment at issue here was made in the course of the

13

prosecution's appropriate inquiry into whether the panel would assess Brown's credibility the same as any other witness. *See Finch v. Commonwealth*, 681 S.W.3d 84, 91 (Ky. 2023) ("The remainder of the complained of language seems to be meant to assess whether anyone in the venire would view a defendant's credibility differently than any other witness. This served the fundamental purpose of voir dire: 'to obtain a fair and impartial jury whose minds are free and clear from all interest, bias, or prejudice that might prevent their finding a just and true verdict.'") (quoting *Newcomb*, 410 S.W.3d at 86). However, such an inquiry may be made by simply asking whether the jury will consider the defendant's credibility the same as it would with any other witness *if* he testifies, while noting his right to testify or to remain silent. Exceeding this boundary and offering opinion as to whether the defendant *will* or *will not* testify places improper pressure upon his exercise of the right to remain silent and is plain error.

The second comment occurred during the prosecution's cross-examination of Brown. During that examination, the prosecutor asked the following line of questioning highlighting that Brown had not previously shared the version of events he testified to at trial:

> Commonwealth: But you do remember a lot of information that you've never provided before today.
>
> Brown: I've never spoken with anybody about this before today.
>
> Commonwealth: But you had the opportunity to do so, didn't you?

This too was plain error. *See Nunn v. Commonwealth*, 461 S.W.3d 741, 751 (Ky. 2015) (holding that prosecutor's closing statement referring to defendant's

14

failure to tell police the version of events he testified to at trial was "obviously improper" and "clear error."). Again, while we need not resolve whether the error was reversible, we reiterate that references by the prosecution to a criminal defendant's silence before trial to undermine the credibility of his testimony at trial is plain error violating the defendant's right to remain silent.

### III. The Admission of Testimony Regarding Authorship of a Post-It Note Violated Brown's Rights Under The Confrontation Clause.

Brown next argues that his Confrontation Clause rights were violated when the Commonwealth asked Detective Adkins to identify who had authored a Post-It note found in Creech's apartment. During the October 2, 2020 search of the apartment, a forensics unit officer saw a pink Post-It note on the side of Creech's refrigerator. The note stated "Ava, this is your old buddy Bill that works at Walmart. Please give me a call and let me know you are alright. Love and care." Notably, the Post-It note had not been observed by Officer Sands during his September 15 search of Creech's apartment, nor did it appear on his body cam footage.

During its opening statement, the prosecution asserted that Brown had written the note as an attempt to deflect suspicion, but that it actually showed his guilt by demonstrating that he was entering and leaving Creech's apartment. However, during trial Detective Adkins reviewed Facebook records and determined that "Bill from Walmart" was a different Bill—Bill Rector. Detective Adkins went to Walmart and spoke with Rector, who confirmed he had written the note and left it on the outside of the door to Creech's apartment.

15

Afterwards, at trial the Commonwealth introduced the Post-It note as an exhibit and then asked Detective Adkins who wrote it. The defense objected and the trial court directed the prosecution to lay a foundation. The prosecutor then elicited testimony from Detective Adkins that he had spoken with a friend of Creech's named Bill who worked at Walmart, and that the Post-It note had been left on the outside of Creech's door. In closing, the prosecution also stated that Bill Rector told Detective Adkins he had left the note on Creech's door.

Brown argues that the significance of the note to the prosecution's case was that it showed someone was entering and leaving Creech's apartment. Brown contends the note and its author were therefore introduced as evidence of Brown's guilt. Brown thus asserts that admission of Rector's statement that he wrote and left the note on the outside of Creech's door was error because Rector did not testify at trial and Brown therefore had no opportunity to cross-examine him regarding those statements. The Commonwealth acknowledges that the statement was hearsay.

We agree that Detective Adkins' testimony that Rector acknowledged writing the note and placing it on Creech's door violated Brown's right of confrontation. The Confrontation Clause of the Sixth Amendment provides that in criminal prosecutions, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause permits the admission of a testimonial out-of-court statement against a criminal defendant only if the maker of the statement is unavailable and there has been

16

a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Here, Rector's statements were testimonial because they were made during the course of police questioning. *Id.* at 52 ("Statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."). In addition, Detective Adkins did not identify Rector as the author of the note until trial was ongoing, and Brown therefore had no prior opportunity to cross-examine Rector. Thus, admission of Rector's statements violated the Confrontation Clause and was error.

## CONCLUSION

For the foregoing reasons, we reverse the sentence and judgment of the Fayette Circuit Court and remand for a new trial.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General